Frederick **DEMBY**, Plaintiff,

v.

**PRESTON TRUCKING COMPANY, INC.,** Defendant.

Civil No. AMD 96–659.

United States District Court, D. Maryland.

April 16, 1997.

---

Kathleen A. Carey, Jordan & Carey, L.L.P., Washington, DC, Linda Eve Percy, Timonium, MD, for Plaintiff.

Richard A. DeTar, Stephen M. Silvestri, Miles & Stockbridge, Baltimore, MD, for Defendant.

## MEMORANDUM

DAVIS, District Judge.

The plaintiff, Frederick Demby ("Demby"), has filed a four-count complaint against his employer, Preston Trucking Company, Inc. ("Preston"), alleging the following claims: hostile work environment on the basis of race and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.;* companion discrimination claims under 42 U.S.C. § 1981; and pendent state law claims of negligent supervision and retention and intentional infliction of emotional distress. Before the Court is Preston's motion for summary judgment as to all of Demby's claims. I have given careful attention to the parties' memoranda and exhibits, and a hearing is not needed. Local Rule 105.6. For reasons explained below, I shall deny the defendant's motion as to the discrimination claims, and grant the motion as to the state law claims.

### I.

As this case is presently before the Court on Preston's motion for summary judgment, I shall "present [Demby's] version of the facts wherever the parties' evidence conflicts, at least to the degree that [his] allegations have support in affidavits, depositions or other documentary evidence." *Paroline v. Unisys Corp.,* 879 F.2d 100, 102–103 (4th Cir. 1989), *vacated in part and rev'd in part on other grounds per curiam,* 900 F.2d 27 (4th Cir.1990) (en banc).

Demby is a forty-eight year old African–American male who has worked for Preston since September 1992. He is semi-literate, having completed only the seventh grade. Demby began working the night shift at

Preston's Federalsburg plant as a "chamber operator," and his primary task was to prepare tires for rubber curing. His immediate supervisors were Robert Stuart, the foreman in the plant, and Phil Johnson, the plant manager.

According to Demby, his troubles began on his first night at Preston. Chamber operators were responsible for processing forty tires during their shifts. Eldridge "Ralph" Smith, a chamber operator on the day shift, would habitually leave eight to ten of his own tires for the night shift chamber operator to process.[1] Aware that Smith was not completing his assignments, Johnson would nonetheless instruct Demby to complete Smith's work in addition to Demby's own work. Demby processed Smith's left-over tires for approximately one month, then he decided to complain to Johnson about having to do Smith's work. According to Demby, Johnson was unresponsive and reminded Demby that as long as he was being paid to work, "it doesn't matter what you're doing...." Demby continued to process more than his share of tires until he moved to the day shift.

Although the largely anecdotal account set forth above appears to stand as an isolated instance of disparate or hostile treatment on the basis of race during Demby's first eighteen months of employment at Preston, nevertheless there is substantial circumstantial evidence that other African–American employees apparently shared Demby's concern that white employees were permitted to do less work than African–American employees. In particular, white employees allegedly played cards, smoked cigarettes, and generally goofed off during working hours.

These undercurrents seemingly burst into the open one day in March 1994 when Andre Jefferson, an African–American worker in the plant, decided to record the alleged lack of productivity among white workers using a video camera. Demby was by then working the day shift, and he had noticed that Smith was lagging behind in processing tires and had walked over to Smith's area to help him catch up. While Demby was in Smith's work area, two white co-workers approached Smith to find out whether Smith knew Jefferson was filming unproductive employees.[2] Angered by the news, and apparently mistaken as to which African–American employee was involved in the videotaping, Smith turned to Demby and said, "you goddamned nigger you want to take pictures, do you." Demby attempted to correct the error in Smith's comprehension and quickly informed Smith that Jefferson was the worker involved, and not Demby. Nevertheless, Smith repeated his racial epithet, and added, "I'll pull my pants down and let you take pictures of my behind."

Several days later, on or about March 28, 1994, Johnson and Stuart held a meeting with the workers in the plant to address the allegations that "there was gambling going on in the shop, racial slurs were being made, and someone was videotaping non productivity." At the meeting. Johnson "made it clear that if I or Bobby [Stuart] saw or heard any of these things happening it would result in immediate dismissal." It should be noted that, as promulgated and seemingly interpreted by Johnson, the policy against the use of racial slurs had to be violated under circumstances in which Johnson or Stuart *personally* were required to see or hear "these things happening" before the promised sanction of dismissal was imposed. As set forth below, this seems to be exactly how the policy was implemented in practice.

1. Ronnie Meredith and Jay Taylor, two of Demby's co-workers, allegedly informed Demby that Smith had also regularly left unprocessed tires for Demby's predecessor, an African–American, to complete during the night shift. Meredith and Taylor told Demby that Johnson condoned Smith's behavior. The co-workers allegedly advised Demby not to complete Smith's left-over tires. Whether this hearsay will he admitted at trial is problematic, but I do not rely upon it for purposes of summary judgment.

2. On this subject, Demby's deposition testimony is unclear. Demby states that the white co-workers inquired of Smith whether Smith knew that Jefferson was "taking video pictures of you laying down on these tubes smoking cigarettes, while these other guys are working." This testimony suggests that, when the two co-workers approached, Smith himself was not working and instead was relaxing atop the rubber. However, Demby testified that the reason he went to Smith's area was because Smith was behind in processing tires, thus suggesting that Smith was working when Demby entered his area. In any event, the exchange that followed is not a matter of factual dispute.

Four days after the meeting, while Demby was speaking with Skip Dukes, a former employee, Jamie Hoffman, the "lead" chamber operator on the day shift, approached, and Hoffman and Dukes began to talk about the "colored folks" that had recently moved into the town of Hurlock, Maryland, where Hoffman and Dukes lived. Dukes was explaining to Hoffman how or why there are albinos because, as Hoffman explained it on deposition, Hoffman "never knew what—how it—I always thought it was like mixed couples and stuff." In any event, Hoffman remarked to Dukes, "yeah, did you see those niggers?"[3] Demby immediately informed Johnson that Hoffman had disregarded the company policy against the use of racial epithets. Johnson did not terminate Hoffman in accordance with the policy Johnson had promulgated and discussed four days earlier. Instead, he called Hoffman and Demby into his office and asked Demby "what would make him happy, did he want Jamie [Hoffman]'s job, you know, did he want Jamie dismissed." Demby reminded Johnson that "the company made the rule" and that it should not be Demby's decision whether to terminate Hoffman. Johnson testified that Demby decided he did not want Hoffman terminated. Hoffman was not terminated. Since the incident occurred, both Johnson and Stuart have recommended, and Hoffman has received, a promotion.

Several months later, on August 10, 1994, Demby experienced yet another situation on the job that caused him to believe that he was being treated unfairly because of his race. While Demby was inspecting tires, Frank Dietrich, a white co-worker, paged Demby over the intercom and advised him to report to the dock. Demby was slightly perturbed, because Dietrich was not Demby's supervisor. Demby reported to the dock and found Dietrich, Stuart, Hoffman, and Meredith there. Stuart was transporting racks of tires to a truck, and Stuart instructed Demby to roll the tires to Meredith. Demby complied, but remained bothered by the request because Dietrich was the "dock man" responsible for the tasks which Demby was performing. The task took approximately forty-five minutes to complete, and throughout the time Demby worked, Hoffman and Dietrich stood by idly, discussing "football players getting ready to go on strike."[4]

The next day, Demby approached Johnson and Stuart to discuss the matter. He demanded to know why he was forced to do Dietrich's job while Dietrich and Hoffman looked on. Stuart, who was present and who had ordered Demby to roll the tires the previous day, did not respond. Johnson told Demby that Dietrich was not rolling the tires because Johnson had given Dietrich and Hoffman other work to do. Demby replied, "if [you] had something for them to do, when were they going to do it," because "from the time I started loading the tires until the time I got done and got down and went back to my job, they were still standing there talking about football." Stuart and Johnson did not reply. Displeased with the lack of an explanation from his supervisors, Demby informed them that he would speak with the "big boss at [the main] office and find out why this stuff was being done to me." Johnson warned Demby that if Demby did not remain at the plant and continue to discuss the matter with Stuart and him, then Demby would be ordered to punch out and go home. Demby insisted on speaking with upper management at the main office and also threat-

---

3. Hoffman asserts that he did not complete the word "nigger" when he was speaking to Dukes. He testified that "[a]s soon as I was saying, I said nig, and realized that Fred then was there, and you know, realized what I said, and I turned towards him and apologized to him." Demby maintains that Hoffman did not apologize.

4. Another discrepancy arises in Demby's testimony. Demby claims that he was inspecting tires when the incident occurred involving Dietrich, Hoffman, Stuart, and Meredith. However, Demby also testifies that he left his work area to ask another co-worker, Russell, whether he wanted

to "run the dogs" over the weekend, and it was while Demby spoke with Russell that Dietrich requested Demby to report to the dock. By Demby's own account, he was talking, not working, when he was called to roll tires. Nonetheless, this discrepancy does not alter the significance of the occurrence for present purposes; neither party disputes that Demby was instructed to go home because he insisted on complaining to Johnson's supervisors about disparate treatment on the basis of race and not because he may or may not have been working at the time he was called to roll tires.

ened to speak to a "lady" at the "human relations board." In response, Johnson ordered Demby to go home.[5]

Demby left work and later went to the main office. He attempted to speak with Bob Boyd, Johnson's superior, but Boyd was not present. Demby explained the situation to Boyd's secretary, and the secretary paged Boyd. After Boyd did not return the page, the secretary took Demby's phone number and assured Demby that Boyd would contact him. Boyd never contacted Demby.

After he left Boyd's office, Demby stopped by the plant to find out whether he should report for work the following day. Stuart told Demby he did not know whether Demby should report, and that Demby should speak with Johnson. When Demby inquired of Johnson, Johnson told Demby that he no longer had a job because Demby "went over-top [his] head."[6] That same day, Demby called the Maryland Commission on Human Relations ("MCHR") and reported the incident. Johnson contends, and the MCHR's Written Findings confirm, that Demby and his wife met with Johnson the following day to discuss what had occurred. Johnson testified that he and Demby did not reach a conclusion as to whether Demby could return to work on Monday, and that Johnson would discuss the matter with Boyd. Demby testified that Johnson called him at home on Sunday morning and told him he could report to work on Monday morning. Demby in fact returned to work on Monday, August 15, 1994. Demby's Charge of Discrimination was officially filed with the MCHP, and the Equal Employment Opportunity Commission ("EEOC") on August 19, 1994.

The ugliest and most distressing incident of racial bigotry and hatred directed at Demby occurred at the plant on September 9, 1994. When Demby arrived at work, Johnson met him at the door to inform him that someone had vandalized his work area. Demby entered his area and found that a swastika had been painted on his desk, the phrase "woch [sic] your back nigger" had been painted on the wall behind his desk,[7] and the radio on his desk had been smashed. Demby immediately called his wife, and she came to the plant. After an hour had passed, and none of the managers had called the police, Demby's wife decided to call and request an officer to inspect the plant and to begin an investigation.

Deputy Newcomb of the Worcester County sheriff's office arrived at the plant, and he spoke with Johnson in Johnson's office. Thereafter, the deputy searched Demby's area in an attempt to locate the paint can that was used in the incident, but his search was unsuccessful. The Dembys insisted that Deputy Newcomb arrange to take pictures of the scene, lift fingerprints, and take the radio for inspection, all to no avail.[8] Deputy Newcomb's Operations Report, completed on September 9, the day of the incident, indicates that "Mr. Phil Johnson Supervisor stated he will call the main office and they will handle the problem." The first page of Deputy Newcomb's report indicates that Deputy Hurley was assigned to follow up on the matter, but the second page of the report indicates the status of the report is "closed."

Johnson called Boyd for advice on how to handle the situation. Boyd advised Johnson to "get [the phrase] off the wall, have a meeting with, you know, the guys in the shop

---

5. Johnson admits that he told Demby to go home on August 11, 1994, because Demby kept "hollering and saying we was going to go be talking to some lady and he was going to Bob Boyd."

6. Johnson testified at his deposition that he had not terminated Demby on August 11, 1994, but rather had "sent him home to cool down." However, Johnson also testified that he did not expect Demby to return to work on the following day. Moreover, when Demby did return to work on Monday, August 15, his work area had been cleared.

7. Johnson told Demby, who does not read, that the phrase painted on the wall merely read, "watch your back." Andre Jefferson ultimately informed Demby that the phrase contained a racial slur. Demby specifically testified that he can not recognize the word "nigger" as it is written.

8. Deputy Hurley, who completed a follow-up investigation, reported that fingerprints were not collected because "there was a substantial amount of dirt and dust, oils and other items that would have inhibited any attempt at recovering any latent fingerprints."

and tell them this would not be tolerated, and whoever—if we caught whoever did it, they would be dismissed, and it was a criminal offense as far as he knew, and they would take all steps to find out who ... had done it." When Demby reported to work on Monday, September 12, 1994, the phrase had been painted over. The swastika remained on Demby's desk for two months, until Demby inquired of Stuart when the swastika would be removed and Stuart gave Demby two cans of red paint so that Demby could paint over the symbol himself.

Johnson assigned Stuart to "handle" the situation. Over the course of two weeks, Stuart "informally" questioned various employees at the plant, asking questions such as "did you see anybody in here [?]" He did not document his conversations, and he did not report his conversations to Johnson. Stuart determined that the perpetrator had probably gained entrance through an unsecured door, and he secured it. Stuart did not inform the sheriff's office or anyone at Preston about the unsecured door. Stuart suspected that either Dietrich or Hoffman committed the crime, but Stuart did not share his suspicion with the sheriff's office or with anyone at Preston except Demby. It appears from the memoranda and exhibits that the perpetrator still has not been identified.

Demby waited in anticipation for management to respond in a significant way to the incident, but he received such no response. Demby's wife called the sheriff's office again, and on September 19, 1994, more than a week after the incident, Deputy Hurley reported to the plant to conduct a follow-up investigation. Demby had already left for the day, but Deputy Hurley spoke with Johnson, who "indicated that the company was actively involved in finding the perpetrator in this incident and that it was not being viewed lightly. [Johnson] stated that Preston Corporate had been notified and that their inves-

tigator was currently in Ohio opening another plant." Deputy Hurley then went to Demby's residence and spoke with Demby. According to Deputy Hurley's written report, Demby stated that he "had an idea who could have been involved however, he knew that he didn't have proof enough to have the individual charged. Therefore he did not want the Sheriff's Office involved." Demby informed Deputy Hurley that he and his wife had called the sheriff's office several times, and they suspected that both the sheriff's office and Preston were attempting to "cover-up" the incident. Demby denies he ever instructed the sheriff's office to end the investigation. Deputy Hurley's report indicates that the status of the case is "closed" and that the "victim" is "uncooperative." [9]

To buttress his claim of hostile work environment, Demby points to numerous other incidents which he believes demonstrate management's disparate treatment of, and tolerance of hostility towards, African–American workers as compared to others. These include: (1) his repeated requests that management repair a broken tool necessary to his work, which were ignored despite an injury Demby suffered from his use of the tool, until a white employee began to use the same tool; (2) the circumstances surrounding an offensive sexual comment Dietrich made to a white, female employee, for which he was immediately reprimanded and forced to apologize; (3) the failure to terminate Smith, in accordance with company policy, for bringing a gun on the premises and leaving it in Demby's work area; (4) finding a dead snake in his trash can; (5) unremedied instances wherein Hoffman would intentionally increase the volume on his radio or bang a shovel against the wall of Demby's work area when he knew Demby was not feeling well; and (6) unremedied instances wherein Dietrich would, during the winter months, open a

---

9. A reasonable fact finder could conclude that the report as written is a classic example of a carefully-structured document designed to give the appearance that care was taken to conduct a thorough investigation although no such care was taken in fact, and that the report was essentially "for the file." It is important to note that this incident was a serious "hate crime" under Maryland law, see Md.Code Ann. Art. 27,

§ 470A(b)(3)(i) (1996 Repl.Vol.), carrying from three to ten years as a maximum punishment, but the Worcester County Sheriff's Office booked it as a mere "malicious destruction of property." This was far more that a simple complaint that Demby's "work station had been tampered with," as Deputy Hurley's report described the incident, it was on its face a direct threat of physical injury.

door near Demby's work area so that dust could blow into Demby's area. Although Preston has marshaled significant evidence to explain why it should not be held responsible for these incidents, or that the incidents simply did not occur in the way or for the reasons Demby contends, the conflicts in the evidence in these regards are not properly resolved on summary judgment.[10]

Demby claims that, as a result of the work environment at Preston, his blood pressure has increased and he has had to take more medication. The work environment also caused Demby to remain angry at his wife. Additionally, Demby links his son's uncharacteristically poor academic performance during the school year with the problems Demby was having at work. Demby testified that each day when he would return home from work, his son would ask, "do you have any problems today, is anybody bothering you today ... He would have been able to get his grades right if he wasn't worried about me." Demby's son attended summer school in order to pass to the eighth grade.

## II.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If "the evidence [is] so one-sided that one party must prevail as a matter of law," the court must grant summary judgment in that party's favor. *Id.* at 268, 106 S.Ct. at 2520. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). *See also Podberesky v. Kirwan,* 38 F.3d 147, 157 ("A district court may not resolve conflicts in the evidence on summary judgment motions ...."), *reh'g, en banc, denied,* 46 F.3d 5 (4th Cir.

1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2001, 131 L.Ed.2d 1002 (1995).

Mere speculation cannot stave off a properly supported motion for summary judgment. *See Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). To survive a motion for summary judgment, a party may not rest on its pleadings, but must demonstrate that specific, material facts exist which give rise to a genuine issue. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, the court assumes that all of the non-moving party's evidence is worthy of belief, and all justifiable inferences are to be drawn in favor of the non-moving party. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Only when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," can the court grant a motion for summary judgment. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. Nonetheless, "a party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial." Wright, Miller & Kane, *Federal Practice and Procedure Civil.2d* § 2725, at 104–05 (2d ed.1993). Proper application of these principles to the record here requires that the discrimination claims be submitted to a jury.

### A. The Title VII Claim

The Supreme Court, in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), recognized that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *See also Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In order to be actionable under Title

---

**10.** Preston also relies heavily upon the absence of any difficulties since Demby's administrative complaints were adjudicated. Such a contention may well be relevant to the issue of damages but is not remotely relevant to the circumstances prevailing in the plant during 1994.

VII, however, the conduct cannot merely generate "offensive feelings in a employee." *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971). *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). Rather, the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive...." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370. *See also Carter v. Ball*, 33 F.3d 450, 461 (4th Cir.1994). Moreover, the victim must "subjectively perceive the environment to be abusive...." *Harris*, 510 U.S. at 21–22, 114 S.Ct. at 370. Although there is no precise test for determining whether a work environment is sufficiently hostile to be actionable under Title VII, the Supreme Court in *Harris* outlined the following factors for consideration in making the determination:

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at 23, 114 S.Ct. at 371.

In order to survive a motion for summary judgment on an abusive environment claim, "the plaintiff must make a *prima facie* showing that [the] harassing actions took place...." *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983). *See also Dwyer v. Smith*, 867 F.2d 184, 187 (4th Cir.1989). *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court of Appeals for the Fourth Circuit described the requirements for a *prima facie* showing in *Paroline v. Unisys Corp.*, as follows:

> [T]he plaintiff must show (1) that the conduct in question was unwelcome, (2) that the harassment was based on [race], (3)

that the harassment was sufficiently pervasive or severe to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer. 879 F.2d at 105. If the plaintiff successfully meets this initial burden, then the employer may still be successful on summary judgment if it is able to prove that "either ... the events did not take place, ... they were isolated or genuinely trivial[,] ... [the employer took prompt] remedial action reasonably calculated to end the harassment," or the employer was unaware of the harassment. *Katz*, 709 F.2d at 256. *See also Dwyer*, 867 F.2d at 187.

■ I conclude that Demby has established a *prima facie* case. A reasonable person could find that Demby's work environment was plagued by "discriminatory intimidation, ridicule, and insult," *see Meritor Savings Bank v. Vinson*, 477 U.S. at 65, 106 S.Ct. at 2405, and Demby himself undoubtedly perceived the environment to be abusive. Demby has recounted several significantly troublesome incidents, spanning the course of several months, that have at their core despicable racial animus. As I observed in *Brumback v. Callas Contractors, Inc.*, 913 F.Supp. 929, 939 (D.Md.1995), "repeated use of the ancient epithet 'nigger' is far from trivial as a matter of law;" the question naturally arises here as to whether the September 1994 hate crime incident, which a reasonable fact finder could readily conclude was an "inside job" perpetrated by a co-worker in the relatively small workplace and was inadequately responded to by Preston, was a foreseeable consequence of the employer's seeming tolerance of bigoted behavior at the plant.

■ Furthermore, Preston has failed to rebut Demby's *prima facie* showing as a matter of law. This is true despite the existence of substantial evidence that, like some victims of overbearing bigotry, Demby may have allowed discrete instances of racially-motivated injury to color his view of *every* slight and insult, whether or not arising from racial hatred. An employer is liable for an employee's racial harassment of another worker if the employer has actual or constructive knowledge that the harassment has

occurred and fails to take prompt and adequate remedial action. *Paroline*, 879 F.2d at 106; *Swentek v. USAIR, Inc.*, 830 F.2d 552, 558 (4th Cir.1987). Despite Preston's explicit policy that the use of racial epithets would result in immediate termination, the company failed to discharge Hoffman when he violated this policy only four days after the policy had been communicated to him. A rational juror could reasonably find it inappropriate that, in light of corporate policy, Johnson put the onus on Demby to determine whether Hoffman should be terminated. A reasonable person could well determine on this record that Johnson's actions and omissions (and thus, Preston's) were not reasonably calculated to end the harassment. Moreover, a reasonable person could conclude that Stuart's random and informal questioning of employees, following, and in light of, Johnson's episodic and ineffectual warnings to employees on the use of racial epithets in the workplace, were not measures that were reasonably likely to curtail the possibility of similar (or more egregious) future occurrences. A reasonable juror could conclude on this record that, unlike the dog of legal lore, which is said to be entitled to one free bite, unreconstructed bigots in the modern American workplace are not entitled to one unsanctioned act of racial bigotry, but that Preston essentially condoned such a regime in its Federalsburg plant. Therefore, summary judgment on the discrimination claims is inappropriate and shall be denied.[11]

### B. The § 1981 Claim

Under 42 U.S.C. § 1981(a), all persons within the jurisdiction of the United States share an identical right to make and enforce contracts. Section 1981 provides protection from discrimination in private employment on the basis of race. *Johnson v. Railway Express Agency*, 421 U.S. 454, 461, 95 S.Ct. 1716, 1720–21, 44 L.Ed.2d 295 (1975); *Long v. First Union Corp. of Virginia*, 894 F.Supp. 933, 945 (E.D.Va.1995), *aff'd*, 86 F.3d 1151 (4th Cir.1996). Since Demby's burden of proof under § 1981 is identical to his burden under Title VII, *Long*, 894 F.Supp. at 945; *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457–458 (4th Cir.1989), I find that there is sufficient evidence favoring Demby upon which a jury could find for Demby and I therefore deny summary judgment on the § 1981 claim.

### C. The Negligent Supervision and Retention Claim

Demby also alleges negligent supervision and retention. However, two unreported opinions by this Court confirm Preston's position that this claim is preempted by the Maryland Worker's Compensation Act, Md.Code Ann., Labor & Employ. Art., § 9–501 *et seq.* (1991 Repl.Vol.). In *Lagrimas v. Gossel*, 1993 WL 18951 (D.Md. Jan.25, 1993) (mem.) (unpublished), Judge Hargrove held that with the exception of injuries caused by an employer's " 'deliberate intent to injure or kill that covered employee,' " the Worker's Compensation Act provides the exclusive remedy to an employee "for an injury or death arising out of and in the course of employment." *Id.* at *3 (quoting Md.Code Ann., Labor & Employ. Art., § 9–509(d)(2)). Accordingly, Judge Hargrove dismissed the plaintiff's claim against her employer for negligence in failing to provide a safe workplace. Additionally, in *Plater v. UE & C Catalytic, Inc.*, 1992 WL 414814 (D.Md. Oct.14, 1992) (unpublished), the sole issue before Judge Murray was whether the Worker's Compensation Act precluded the plaintiff from pursuing claims of negligent hiring, retention and supervision. Judge Murray concluded that the plaintiff's claims were indeed barred by the Worker's Compensation Act's exclusivity provisions. That Demby's claims are for dignitary injuries does not change the analysis. A cause of action for negligent retention existed at common law, *see Hastings v. Mechalske*, 336 Md. 663, 677 n. 8, 650 A.2d 274, 281 n. 8 (1994); *Athas v. Hill*, 300 Md. 133, 139, 148, 476 A.2d 710, 713, 718

---

11. Whether Demby has asserted a cognizable "retaliation" claim is problematic, at best, on the present record. In one view, he seems to have made a claim for two days of unpaid wages, arising from his argument on August 11, 1994, with Johnson and his subsequent "discharge" and "rehiring." On the other hand, there seems to be a suggestion that he has a novel "retaliatory hostile environment" claim. If this case reaches the pre-trial conference stage, I shall require supplemental briefing on the retaliation claim.

(1984); *Merchants' & Miners' Transp. Co. v. Maryland,* 108 Md. 564, 569, 70 A. 413, 415 (1908); *Wonder v. Baltimore & O.R.R. Co.,* 32 Md. 411, 417–18 (1870), and, accordingly, may only be predicated on common law causes of action, *Bryant v. Better Business Bureau of Greater Maryland,* 923 F.Supp. 720, 751 (D.Md.1996); *Hays v. Patton–Tully Transp. Co.,* 844 F.Supp. 1221, 1223 (W.D.Tenn.1993). As such, Title VII may not form the predicate for claims of negligent retention and supervision. *Bryant,* 923 F.Supp. at 751; *Hays,* 844 F.Supp. at 1223. Summary judgment shall therefore be granted on the negligent supervision and retention claim.

### D. The Intentional Infliction of Emotional Distress Claim

■ In order to prove a cause of action for intentional infliction of emotional distress in Maryland,[12] the plaintiff must demonstrate the following:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

*Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611, 614 (1977). Recovery under this theory of liability has been severely limited in Maryland. As explained by the Maryland Court of Appeals in *Figueiredo–Torres v. Nickel,* 321 Md. 642, 653, 584 A.2d 69, 75 (1991), " '[i]n developing the tort of intentional infliction of emotional distress, whatever the relationship between the parties, recovery will be

meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.' " (quoting *Hamilton v. Ford Motor Credit Co.,* 66 Md. App. 46, 61, 502 A.2d 1057, 1065, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986)).

■ Even assuming Demby has presented sufficient evidence of Preston's intent and outrageousness,[13] I conclude that Demby is unable to set forth sufficient evidence to meet the fourth element of a cause of action for intentional infliction of emotional distress in Maryland—severity of injury. A recent Maryland Court of Appeals opinion appears to require an elevated level of distress for claims of intentional infliction of emotional distress for claims based on racially discriminatory conduct. As described by Judge Eldridge in his dissent from the majority's opinion in *Caldor, Inc. v. Bowden:*

[T]he majority's requirement that, to recover for intentional infliction of emotional distress, one must have suffered a "disabling emotional response that hindered his ability to carry out his daily activities," will likely work against many members of groups which have, unfortunately and through no fault of their own, suffered more discrimination, harassment and abuse in our society than that suffered by the majority of individuals. Many members of certain minority and socio-economic groups, who have suffered discrimination and abuse, have developed a tougher hide than many other persons. Many of those who have more frequently been the victims of outrageous conduct have developed, from experience and necessity, the ability to continue functioning in their daily activities. While the emotional hurt may

---

**12.** The law governing Demby's state claims is that of the forum state, Maryland. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

**13.** It should be noted that I have grave doubt whether the conduct alleged here rises to the level of "outrageousness" sufficient for this tort under Maryland law. While racial epithets are indubitably abhorrent, the conduct imputable to Preston does not appear to rise to the high level of outrageousness that the Maryland Court of Appeals has required for a cause of action based on intentional infliction of emotional distress.

*Cf. Figueiredo–Torres,* 321 Md. at 655, 584 A.2d at 76 (behavior of psychologist who, while acting as plaintiff's and his wife's marriage counselor, had sexual relations with the plaintiff's wife, was sufficiently outrageous); *B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175 (1988) (intentional exposure of plaintiff to transmission of herpes was outrageous); *Young v. Hartford Acc. & Indem.,* 303 Md. 182, 492 A.2d 1270 (1985) (insurer's insistence that plaintiff submit to a psychiatric examination calculated to harass the plaintiff and to either force her to abandon her claim or to commit suicide deemed outrageous).

be as strong or stronger, the ability to function normally may be greater. Under the majority's formulation of the tort, however, those persons who are able to carry on with their principal daily activities will not be able to recover damages for their severe emotional distress resulting from extreme and outrageous intentional conduct. In its application, the tort will discriminate against those who have developed a degree of resiliency because of past discrimination.

330 Md. 632, 676, 625 A.2d 959, 980 (1993) (internal citation omitted).

In this case, Demby has not alleged that his distress has hindered his ability to conduct daily activities. Rather, Demby alleges that a pre-existing blood pressure condition has required more medical attention, and his son has been affected academically. While it is questionable whether Demby's work environment caused these problems for him and his family, it is certain that these problems are not sufficiently "severe" under Maryland law. Therefore, I shall grant summary judgment on the intentional infliction of emotional distress claim.

### III.

For the reasons discussed above, I shall deny summary judgment on the Title VII and § 1981 claims, and grant summary judgment on the negligent retention and supervision claim and the intentional infliction of emotional distress claim. A separate order follows.

### ORDER

In accordance with the foregoing Memorandum, it is this 16th day of April, 1997, by the United States District Court for the District of Maryland, ORDERED

(1) That the Defendant's Motion for Summary Judgment BE AND IT HEREBY IS GRANTED IN PART AND DENIED IN PART; and it is further ORDERED

(2) That the Clerk mail a copy of the foregoing Memorandum and this Order to counsel of record.