Mohamad Mohafuzul KARIM, Plaintiff

v.

STAPLES, INC., Defendant

No. CIV.A.AMD 01–1976.

United States District Court,
D. Maryland.

July 23, 2002.

Howard J. Needle, Baltimore, MD, for plaintiff.

Charles F. Walters, Seyfarth Shaw, Washington, DC, Abbey G. Hairston, Seyfarth Shaw, Baltimore, MD, for defendant.

## MEMORANDUM

DAVIS, District Judge.

This employment discrimination action was instituted by Mohamad Karim ("plaintiff" or "Karim") against his employer, Staples, Inc. ("defendant" or "Staples"), alleging, *inter alia*, hostile work environment based on national origin, color, race and religion under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Plaintiff filed the case pro se, but he retained counsel shortly after the case was filed. Now pending are (1) defendant's motion for summary judgment as to all remaining claims and (2) plaintiff's motion to stay ruling on the motion for summary judgment and for an extension of the discovery deadline. The issues have been fully briefed, and no hearing is necessary. For the reasons set forth below, I shall deny plaintiff's motion and grant defendant's motion.

## I.

I first address plaintiff's motion to stay a ruling on the summary judgment motion while additional discovery is allowed. Plaintiff is a native of Bangladesh; his first language is Bengali. He does not read or write English; he is assisted with reading and writing English by his wife. In his motion for stay, plaintiff makes the extraordinary contention that recently his attorney learned that plaintiff did not understand the questions that were put to him at his deposition. *See Mot. to Stay Ruling on Mot. for Summ. J.* ¶ 1. In short, plaintiff argues that he was unable to express himself clearly in his responses to questions at his deposition and that his answers were misleading.

According to plaintiff, his attorney only became aware of this problem when Karim's wife read the transcript of his deposition and *she* concluded that plaintiff's answers were often incorrect expressions of what he wanted to say. *Id.* ¶ 2. Plaintiff's wife had him tested by an alleged "expert" in English for speakers of foreign languages. According to an "Informal Language Proficiency Assessment" prepared by this "expert," the test demonstrated that plaintiff "*may* have significant difficulty in a mainstream English classroom." *Id.* Attach. (emphasis added). It appears that plaintiff received a score of "D" on the instrument, which employed a scale of "A" to "F," with "A" meaning "non-English speaking" and "F" signifying "fluent English speaking." *Id.*

Admittedly, defendant relied heavily on plaintiff's deposition testimony in its motion for summary judgment. Plaintiff argues from this fact that this testimony does not accurately reflect the facts surrounding his experience in the Staples workplace; he maintains that it would be unjust for the court to adjudicate the summary judgment motion on the present rec-

ord. Specifically, plaintiff seeks to have the court require the defendant to conduct a *second* deposition of the plaintiff in which the questions would be translated into, and plaintiff would be permitted to answer the questions in, the Bengali language.

I am constrained to reject this remarkable request. Karim's motion does not remotely suggest how any specific material fact he reasonably believes exists, that has not already been adduced, would preclude summary judgment. *See City of Rome v. Glanton*, 958 F.Supp. 1026, 1039 (E.D.Pa.), *aff'd w'out op.*, 133 F.3d 909 (3rd Cir.1997). That is, Karim does not offer a single specific instance wherein his belated assertion of English comprehension difficulty would change any answer he provided during his deposition.

The motion sets forth only unsupported, conclusory assertions that plaintiff's deposition answers are not accurate. Such conclusory declarations are not sufficient to persuade me to take the extraordinary step plaintiff has requested. *Cf. Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 535 (5th Cir.1999) ("The movant must be able to demonstrate how postponement and additional discovery will allow him to defeat summary judgment; it is not enough to 'rely on vague assertions that discovery will produce needed, but unspecified, facts.'" (quoting *Washington v. Allstate Insurance Co.*, 901 F.2d 1281, 1285 (5th Cir.1990))); *Wesley v. Don Stein Buick, Inc.*, 996 F.Supp. 1299, 1309 (D.Kan.1998)("Mere conclusory assertions that additional discovery is necessary are insufficient for purposes of Rule 56(f)." (citation omitted)).

Even more fundamentally, the transcript of Karim's deposition testimony indicates that *he understands spoken English and does not need an interpreter.* The record reveals that Karim proceeded with two non-consecutive days of deposition without ever mentioning a need for an interpreter.

Specifically, plaintiff does not indicate anywhere in his deposition that he has any difficulty understanding spoken English. In fact, he testified to the contrary:

Q: Now, you were just administered an oath a few moments ago. Do you understand that your testimony today is to be given under oath?

A: Yes.

Q: And do you understand that oath?

A: Yes.

\* \* \* \* \* \*

Q: If you don't understand a question of mine, please ask me to repeat it. I'll be glad to try and clarify it or ask it again in a way you understand it. If you don't have a question clarified or repeated, I'm going to assume that you understand it fully.

A: Yes.

\* \* \* \* \* \*

Q: Okay. Is there any reason today why you cannot testify fully and accurately? Is there any medical reason why you will not be able to give full, truthful answers today to the questions that I will ask you?

A: I, I will answer truthfully.

Q: So there's nothing interfering with your ability to answer questions?

A: No.

*Karim's Dep.* at 5–8. Indeed, Karim specifically distinguished his ability to speak and understand spoken English from his ability to read and to write it, by ensuring that all present at his deposition were aware that he could not read and write English, except minimally at work with things such as signs. *Id.* at 27. Yet, he never mentioned any speaking or comprehension difficulties. His unexplained failure to do so, coupled with the clear record of Karim's more-than-adequate comprehension of spoken English, defeats Karim's

motion. *Cf. Esteves v. Esteves,* 680 A.2d 398, 405–06 (D.C.App.1996) (determining that the plaintiff was not entitled to an interpreter, in part, because, though her English was not perfect, "it was good enough to be understood and to make herself understood, even though she claimed she could not read English very well" and "at no time did she advise the trial court that she was not an English-speaking person").

This conclusion is bolstered by the fact that the record does not demonstrate that plaintiff has ever needed an interpreter in the history of his almost five years of employment with Staples or in the course of this litigation arising out of his employment. Karim has never requested or required an interpreter to do his job at Staples. Further, he did not use an interpreter during the Maryland Commission on Human Relations investigation of his discrimination charge which preceded the filing of this case. Rather, the facts of record establish that plaintiff understood the questions posed, was able to communicate with his counsel, and that his ability to comprehend and provide testimony was in no way inhibited. Accordingly, plaintiff's request to require defendant to conduct a further deposition shall be denied.

## II.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matushita Elec. Indust. Co v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

## III.

The following account of material facts is set forth in the light most favorable to plaintiff, the nonmovant.

## BACKGROUND

Staples sells office products and related services at retail stores around the country. Its Mid–Atlantic Distribution Center

is located in Hagerstown, Maryland. This facility receives, warehouses, and distributes products to Staples' retail stores. Karim is 41 years old and was born in Bangladesh. He moved to the United States in 1990. *Karim Dep., February 22, 2002*, at 11, 14 (hereinafter *Karim Dep. I* ). He returned to Bangladesh in 1993, where he stayed until returning to the United States in 1996. *Id.* at 15. Karim has an ex-wife and two children living in Bangladesh. *Id.* at 19–20. He married his current wife, Ann ("Mrs.Karim"), in 1992 in Washington, D.C. before he returned to Bangladesh. *Id.* at 17–18. Mrs. Karim has assisted plaintiff in filing his various complaints against Staples' employees.

### Plaintiff Begins Work at the Mid–Atlantic Distribution Center

Plaintiff began working at the Mid–Atlantic Distribution Center in or about December 1997 as an employee of the Davis Temporary Employment Agency ("Davis"). *Id.* at 31. He worked banding products together as a member of the Bulk Department C Team, alongside Staples' regular, full-time C Team employees. *Id.* at 143, 153. The C Team works the night shift, i.e., 7:00 p.m. to 7:00 a.m. *Id.* at 144. While working at Staples for Davis, plaintiff socialized with Staples' C Team employees, e.g., he went out for drinks, and he had no complaints about how these employees treated him. *Id.* at 153.

In late March 1998, Karim became a regular, full-time Staples C Team employee. *Id.* He initially continued the banding work and later became a bulk selector. *Id.* at 155. As a bulk selector, Karim used fork lifts, pallet jacks, and other machinery (collectively referred to as Material Handling Equipment ("MHE")) to retrieve items from the warehouse. *Id.* at 155–56. He continued to work a 7:00 p.m. to 7:00 a.m. shift.

## ALLEGED INCIDENTS WHILE PLAINTIFF WORKED ON C TEAM

Apparently, the gravamen of plaintiff's hostile environment claim is plaintiff's displeasure with a series of incidents involving co-workers. The earliest incidents are described here.

### 8/7/98 *Diehl Forklift Accident*

On August 7, 1998, a fellow bulk selector, Randy Diehl ("Diehl"), a white male, bumped plaintiff's ankle with his forklift while plaintiff and other C team employees were standing in the warehouse. This incident caused plaintiff to go to the hospital for medical attention after work. *Id.* at 198–99; *Def.'s Ex. 5* (Staples' Incident Report). According to Diehl's deposition testimony, immediately before the incident, Diehl had asked plaintiff several times to move aside so that he could park his forklift; plaintiff, however, did not move and gave Diehl "the finger." *Diehl Dep.* at 10.

According to the incident report, plaintiff did not feel that Diehl hit him intentionally. *Def.'s Ex. 5*. However, nine days after the incident, Mrs. Karim wrote a letter to the Staples Human Resources Department accusing Diehl of intentionally striking plaintiff. *Def.'s Ex. 6* (August 17, 1998 Letter Concerning Randy Diehl Incident). Yet, plaintiff testified that he is not angry with Diehl, and the two have continued to socialize since that incident. *Karim Dep. I* at 168, 216.

Sandy Brisentine ("Brisentine") and Amy Myers ("Myers"), the Human Resources Director and the Human Resources Manager for the Mid–Atlantic Distribution Center, respectively, investigated this incident (as well as others discussed below). They spoke with plaintiff, Diehl and other potential witnesses. *Decl. of Walt Lachenmayr*, Attach. A (September 4, 1998, Brisentine Investigation Notes) (hereinafter *Lachenmayr Decl.*); *Karim*

*Dep.* at 216–19. They, along with C Team manager Doug Zeis ("Zeis"), then met with plaintiff and informed him of the results of their investigation. Although Staples found no evidence that Diehl had hit plaintiff intentionally, Diehl, in accordance with Staples' MHE policy, received a written warning in connection with the operation of his forklift on the day in question. *Lachenmayr Decl.*, Attachs. A, B (Written Warning). Plaintiff was also assured that no one would be permitted to retaliate against him for his allegations. *Id.* Attach. A.

### 8/15/98 *Stottlemyer Timelock Incident*

A second incident—termed an "assault" by plaintiffis discussed in a letter dated August 17, 1998, to the Staples Human Resources Department, which Mrs. Karim wrote and plaintiff signed. Plaintiff alleges that on August 15, 1998, he was waiting to clock out at the end of a shift when fellow bulk selector Ron Stottlemyer ("Stottlemyer"), a white male, shoved him, told him to move, and stated that he hated "Immigrant Motherfuckers." *Karim Dep.* at 240, 257–58; *Def.'s Ex. 8* (August 17, 1998, Letter Concerning Ron Stottlemyer Incident). Furthermore, in an August 24, 1998, memorandum written by Mrs. Karim, it was alleged that plaintiff had heard, on August 16, 1998, that Stottlemyer had told an unnamed person that he would kill plaintiff if he told Brisentine about the above incident. *Def.'s Ex. 9* (August 24, 1998 Memorandum). Plaintiff does not remember who told him that Stottlemyer had made this statement. *Karim Dep.* at 236–37.

Brisentine and Myers conducted an investigation of plaintiff's allegations; they interviewed the witnesses whose names plaintiff had provided, and then met with plaintiff and Zeis to discuss the results of their investigation. *Lachenmayr Decl.*, Attach. A; *Karim Dep.* at 259–60, 264–65. They determined that Stottlemyer had made statements that were improper ("I don't like camel jockeys;" "Why don't you go back to your country, I hate Indians [sic]." *Id.)* but they did not conclude that he had committed an assault. *Lachenmayr Decl.*, Attach. A. They concluded further that Stottlemyer should be disciplined. *Id.* Stottlemyer received a final written warning on September 3, 1998, and was specifically warned not to retaliate against plaintiff for his complaint against Stottlemyer. *Lachenmayr Decl.*, Attach. C (Stottlemyer Final Written Warning); *Stottlemyer Dep.* at 44–45. Karim was told that there was to be no retaliation against him for bringing his complaint. *Id.* Thereafter, plaintiff continued to socialize with Stottlemyer, e.g., buying him drinks at bars and giving him cigarettes. *Karim Dep. I* at 239–40; *Stottlemyer Dep.* at 46.

### 1/22/99 *Letdown Incident*

On or about January 22, 1999, three coworkers on the C Team ignored plaintiff's request for a "letdown"-using a forklift to remove a large item from a shelf and placing it on the ground for Karim to transport-after he had been calling for a letdown for four to six minutes. *Karim Dep. I* at 277–79, 283–84; *Def.'s Ex. 10* (January 22, 1999 Witness Statement). A witness statement was prepared for plaintiff by his supervisor, Wayne Murphy, in light of plaintiff's difficulties writing in English. *Id.* Plaintiff recalls that one of the coworkers who ignored his letdown request was Stottlemyer and believes that another was bulk selector Bill Perrot ("Perrot"). *Karim Dep.* at 280, 292. Plaintiff admitted that it can take a long time, sometimes twenty minutes, to get someone to give a bulk selector a letdown when they are busy and that sometimes a forklift operator will just drive by without even stopping to give a letdown. *Karim Dep.* at 282–83. Karim alleges that later

that day, a coworker (to his best recollection it was Perrot) told Karim that Stottlemyer said to the coworker that if plaintiff complains to his manager about not getting a letdown, Stottlemyer would "wipe [plaintiff's] ass." *Karim Dep. I* at 284–85. Karim did not hear Stottlemyer make this statement. *Id.*

**5/24/99 Thomas Mack Pallet Jack Incident**

Karim filed a report, written by his wife but signed by plaintiff, alleging that on May 24, 1999, some furniture on a forklift being driven by fellow C Team bulk selector Thomas ("TJ") Mack (referred to here as "Mack"), a white male, fell off of his pallet jack onto Karim's pallet jack. *Def.'s Ex. 11* (May 24 1999 Incident Report). Plaintiff was not injured. Immediately after this incident, Mack screamed at Karim to "shut up." *Id.* Prior to this incident, plaintiff had never spoken with Mack. *Karim Dep. I* at 191.

In a May 31, 1999, memorandum to Staples personnel written by Mrs. Karim for plaintiff, Karim asserts that on May 26, 1999, Mack followed plaintiff and coworker Jim McPeak ("McPeak") to a nearby gas station and sat outside in his car while plaintiff and McPeak went inside to get coffee. *Def.'s Ex. 12* (Mem. to Staples Personnel dated May 31, 1999). According to Karim, McPeak stated that Mack had been watching Karim "like crazy" and that he had heard that Mack carries a knife. *Id.* As a result of McPeak's statements regarding Mack, Karim was afraid to get out of the vehicle to get his coffee. *Id.* However, Mack did not say or do anything to plaintiff while he was sitting in his car in the gas station parking lot. *Karim Dep. II* at 28–30.

Brisentine conducted an investigation into Karim's allegations and met with McPeak, Mack, and Brian Koontz ("Koontz"). Koontz had supposedly witnessed the fork lift incident. *Lachenmayr*

*Decl.,* Attach. D (June 11, 1999 Brisentine Investigation Notes). The investigation revealed no improper conduct by Mack and indicated that the forklift accident may have been at least partially plaintiff's fault. *Id.* Brisentine then met with plaintiff to discuss the results of the investigation. *Id.* Brisentine told him, among other things, that while it is possible that some of his coworkers had certain opinions about him based on his nationality or ethnicity, there was no evidence that they had treated him differently as a result. *Id.* Karim replied in the negative when Brisentine asked plaintiff if there were any other employees that she could talk to as part of her investigation. *Id.* When plaintiff indicated that he felt that Brisentine thought that he was lying about these incidents, she assured him that she did not think that he was lying. *Id.* Finally, Brisentine told plaintiff that based on his apparent continued fear for his personal safety, he could transfer to another bulk department team, mentioning that while she usually does not transfer employees to solve workplace problems, she would in this instance. *Id.* Karim decided to think about the offer of transfer. *Id.*

**Questions of Plaintiff by C Team Employees**

Karim further contends that his C team coworkers asked him discriminatory and offensive questions related to his national origin and his Muslim religion, e.g., how many wives Muslims and/or men from his country have. *See Karim Dep. I* at 159–61; *Karim Dep. II* at 12. Plaintiff named two employees who had asked such questions: Stottlemyer and Craig Duffy ("Duffy"). According to Karim, Stottlemyer said that he hates "Indian peoples" and "camel jockeys." *Karim Dep. II* at 11–12. Duffy asked Karim about how many wives Muslims have. *Karim Dep. I* at 196. Stottlemyer, however, testified he "really"

did not know Karim's religion. According to his testimony, Karim thought these questions were "funny," and indeed, Karim admits that they did not bother him and still do not bother him. *Karim Dep. I* at 161, 197.

### Plaintiff's Transfer to D Team

Plaintiff sent a June 13, 1999, memorandum, prepared by his wife, to Bill Ross ("Ross"), the District Director who is in charge of the Mid–Atlantic Distribution Center. *Def.'s Ex. 13* (June 13, 1999 Mem. to Bill Ross). In the memorandum, Karim states that Brisentine told him on June 11, 1999, that she believed that his coworkers "don't like" him because he is from Bangladesh, even though she "doesn't have enough evidence for the incidents to take action against these people." *Id.* Plaintiff further asserts that Brisentine offered to transfer plaintiff to another shift or department. *Id.* In addition to the memorandum, Karim left Ross a telephone message indicating that he did not feel safe coming to work. *Dep. of Bill Ross,* at 5–6; 35–36.

In response to the memorandum and plaintiff's telephone call, Ross immediately scheduled a meeting among himself, Brisentine, Zeis, and plaintiff. *Id.* at 6. At that meeting, plaintiff acknowledged that Staples had investigated all of his complaints to date, but that it was unable to substantiate his allegations. *Def.'s Ex. 15* (June 17, 1999 Mem. to Karim from Ross). Plaintiff was reassured that Staples would not tolerate the sort of conduct he had reported, and would continue to investigate any future complaints he lodged. *Id.* When plaintiff stated that Brisentine believed that he was being harassed at work (apparently in reference to their June 11 conversation) Brisentine informed him that she had not said this, and reiterated what she told him during their June 11 discussion, *supra. Ross Dep.* at 7.

In light of his safety concerns and despite the lack of any evidence supporting these concerns, plaintiff was again offered the opportunity to transfer to another team or department. *Def.'s Ex.* 15; *Ross Dep.* at 7–8. He indicated at the meeting that he wanted to work on Rob McAllister's team, Team D, and Staples honored his request beginning June 23, 1999. *Def.'s Ex.* 15. Moreover, at this meeting, it appears that Ross made the effort to make certain that plaintiff understood what was being discussed. *Ross Dep.* at 19–21, 23. Ross then followed up the meeting with a June 17, 1999, memorandum summarizing the meeting, which plaintiff acknowledged receiving and having his wife read to him, and by speaking with plaintiff approximately two weeks after the meeting. *Ross Dep.* at 19–20; *Def.'s Ex.* 15.

## ALLEGED INCIDENTS AFTER PLAINTIFF'S TRANSFER TO D TEAM

The alleged harassment of the plaintiff continued even after plaintiff transferred to a new team, as described here.

### 8/1/99 Streets Battery Changing Incident

Plaintiff contends that on August 1, 1999, he was waiting for fellow D Team employee, William Streets ("Streets"), a white male, to change the battery on his forklift when Streets said to him: "What the fuck do you want." After plaintiff ignored him, Streets repeated his question. *Def.'s Ex.* 19 (Witness Statement, 8/1/99). Staples investigated the incident, interviewing and taking statements from Streets, Andy Ashway (an employee who was in close proximity to the alleged incident) and the Maintenance Coordinator, Jeff Dickson, to whom plaintiff complained about Street's conduct. *Lachenmayr Decl.,* Attach. E (Investigation Notes).

Brisentine and Myers then met with plaintiff and informed him that the investigation revealed no improper conduct by Streets toward plaintiff. *Id.*

### 8/8/99 DeHoyos Incident

Plaintiff alleges that on August 8, 1999, after he had placed a balled up piece of shrink wrap on a pallet, his coworker Chris DeHoyos ("DeHoyos"), a white male, "got smart with me and gave me a dirty look. He said 'Go get your shrink wrap off the pallet.'" *Def.'s Ex.* 20 (incident report). Plaintiff asked DeHoyos: "Why do you talk to me with no respect?" to which DeHoyos allegedly responded: "You don't have respect. Why do you expect respect." *Id.* Plaintiff then brought the matter to the attention of the D Team Manager, McAllister, who offered to help plaintiff complete a witness statement. *Id.* Plaintiff chose to complete the statement at home. *Id.* Plaintiff further alleges that two coworkers, Brandon Tarner and Marvin Durborow, told him that DeHoyos had treated them the same way he allegedly treated plaintiff on August 8, 1999. *Id.*

Staples investigated plaintiff's allegations, obtaining statements from plaintiff, DeHoyos, McAllister, Tarner, Durborow and Joseph Ketterman (who also had previously been told by DeHoyos to pick up wrapping material). *Lachenmayr Decl.,* Attach. F. Although DeHoyos was not found to have engaged in any misconduct, McAllister assured plaintiff that he had told DeHoyos to bring cleaning concerns directly to him, and that DeHoyos was only speaking out of the frustration of having to spend so much time keeping his work area clean.

### 9/99 Perrot Forklift Incident

Plaintiff alleges that in September 1999 Bill Perrot's forklift struck his forklift. *Karim Dep. II* at 41–42. Plaintiff was not injured and he did not file a report on this incident. Rather he mentioned it to a supervisor. *Id.* at 42, 100–01.

### 7/24/00 Ziler Incident

According to an incident report dated July 24, 2000, plaintiff made a "joke" to a coworker who was standing idle with his hands in his pockets, in which he said: "You look like [a] boss, I'm gonna buy you a suit." *Def.'s Ex.* 23. Approximately 15 minutes later, Chris Ziler ("Ziler"), a bulk department coordinator on the C Team and apparently the "boss" to whom the "joke" had reference, approached plaintiff "with his eyes big, his face very red and in a loud demanding voice said 'What did you say about me.'" *Id.* Ziler again asked plaintiff: "What did you say about me?· I want to know what you said!" *Id.* Plaintiff described this incident as "intimidating," "assaulting," and "harassing." *Id.* According to this report, plaintiff related the incident to Team Manager Mike Lowell. *Id.* On the night of this incident, plaintiff was working overtime on C Team, although he had been working on the D Team since June 1999. *Karim Dep. II* at 98.

Later that night, Ziler was approached by an employee who said that plaintiff reportedly was upset with Ziler. *Ziler Dep.* at 13. Ziler then sought out plaintiff and apologized to him. *Id.* A Human Resources official spoke with Ziler the next day, and Ziler again sought out plaintiff and apologized to him. *Id.* Plaintiff and Ziler shook hands and plaintiff said that it was all right. *Id.*

### 2/20/01 Nyberg Incident

In an incident report dated February 20, 2001, plaintiff states that after he left work on February 20, 2001, he and several employees were talking in the Staples parking lot when fellow bulk selector "Chris [Nyburg] came towards me, pushing up his sleeves and visibly shaking and said to me in a hostile, sarcastic voice: 'You have big guts, I can take you right now.' I told him: 'Chris, I'm not talking to you.' I told him I'm going back inside the building to

talk to Randy. I went to talk to Randy about what just happened and then left Staples building to go home." *Def's Ex.* 24.

Staples Human Resources Manager, Jay Rudolph, investigated the report. *Rudolph Dep.* at 15–18. The investigation involved interviewing employees and obtaining witness statements from Nyberg, a white male, and five witnesses to the incident. *Id.; Lachenmayr Dep.*, Attach. G (witness statements). The investigation revealed that Nyberg had become upset at plaintiff because he believed that plaintiff was criticizing his work, and that Nyberg then told plaintiff not to talk about him behind his back and that they could settle any problems they had right there. *Lachenmayr Dep.*, Attach. G. According to one witness, Gary Angle, Nyberg repeatedly used a great deal of profanity during this exchange. *Id.* Neither the witnesses, nor plaintiff, accused Nyberg of saying or doing anything related to plaintiff's nationality, race, religion, or color. Nyberg received a final written warning for his conduct. *Lachenmayr Dep.*, Attach H.

### 7/29/01 Creeden Incident

Plaintiff contends that on July 29, 2001, D Team shipping employee, Patrick Creeden ("Creeden"), a white male, parked his pallet jack in front of plaintiff's pallet jack. *Def.'s Ex.* 26. Another employee asked Creeden why he parked in front of plaintiff, and as a result, Creeden moved his forklift. Plaintiff witnessed this incident, shook his head, and left on his pallet jack. *Id.* According to the report, Creeden then followed plaintiff and said to him several times: "Motherfucker, why did you shake your head?" and then said: "Motherfucker, I'm gonna take care of you." *Id.* Plaintiff told Creeden that he did not shake his head at him and then went to the shipping office to explain the situation to Shipping Coordinator, Kirk Banks (referred to in the report as "Cark"). *Id.*

Banks called Creeden on the telephone and apparently was told by Creeden that he was angry at plaintiff for criticizing his work two nights ago. *Id.* Banks then told plaintiff that Creeden wanted to apologize to plaintiff, but plaintiff would not accept the apology and wanted to report the incident in accordance with "company policy." *Id.* Plaintiff reported the incident to Human Resource Manager Rudolph as well as to bulk department supervisor Randy Stotler. *Banks Dep.* at 17–18. Banks, an African–American, does not believe that Creeden's actions toward plaintiff on this night were based on any intolerance of plaintiff's national origin, race or color. *Id.* at 29.

Creeden subsequently signed a written acknowledgment stating: "I Patrick Creeden understand the actions which I displayed on [July 28, 2001] toward Mohomad Karim were totally unacceptable and will not be tolerated at Staples. I know that swearing and/or threatening another associate could lead to my termination. I have met with Mohomad and have apologized for my action." *Lachenmayr Decl.*, Attach. I. In turn, plaintiff signed a written acknowledgment stating: "I Mohomad Mohafuzal Karim am satisfied with Patrick Creeden's apology for actions on [July 28, 2001]. I feel the problem has been addressed and handled in [a] professional manner to help prevent problems in the future. I understand Staples and its Management do not take harassment lightly and any reoccurrence of this type of behavior will not be tolerated." *Id.*, Attach. J.

### 10/22/01 Hamil Incident

Plaintiff asserts that on October 22, 2001, the following occurred as he was logging out of the computer system:

I pulled my pilot [pallet] jack in front of the jackpot because there is a computer there to log out on over there. As I logged out I heard a noise and turned my face to look back toward the noise and I saw Julie Hamil, Shipping Supervisor, took my jacket and clip board with paperwork and with a look of anger and her arms swinging real hard she threw my jacket and clip board to the floor. As soon as she saw I was coming to the pilot [pallet] jack, she picked up the jacket and clip board and put it back.

*Def.'s Ex.* 27 (Incident Report, October 22, 2001). Plaintiff reported the incident to Team Manager Doug Zeis when he got home. *Id.*

Staples spoke that same day with Hamil, a white female, who said that she saw a pallet jack with a coat and clipboard on it when she came out of the shipping office, assumed the pallet jack belonged to one of her shipping employees, and, having instructed her employees not to leave their pallet jacks in this area, removed the coat and clipboard from the pallet jack. *Lachenmayr Decl.*, Attach. K. When plaintiff, who was standing behind her, said that the items were his, she asked him to move the pallet jack and he agreed. *Id.*

Rudolph and Hamil then met with plaintiff that night, explained to him that her conduct was a result of a misunderstanding, and apologized numerous times to plaintiff. *Rudolph Dep.* at 37–38; *Lachenmayr Decl.*, Attach. L. After it was determined that Hamil had given varying accounts of her actions concerning plaintiff to Zeis and to Human Resources Director Walt Lachenmayr during Staples' investigation, and in light of recent unrelated problems, she received an "Unsatisfactory Performance" memorandum from Zeis. Hamil had no supervisory authority over plaintiff and did not work on the same shift. *Id.* ¶ 6.

**STAPLES' POLICIES AND TRAINING**

All managers and employees at Staples' Mid–Atlantic Distribution Center receive an Associate Guidebook that contains, among other policies, an Equal Employment Opportunity policy, an Open Door Policy, an employee communication policy, policies prohibiting workplace violence, discrimination, and harassment (including avenues for reporting perceived harassment), a Problem Resolution policy and procedure, and numerous references to Staples' 1–800 Associate Help Line that allows employees to make anonymous complaints. *Lachenmayr Decl.* ¶ 4, Attach. N. Staples also has a company-wide associate guidebook available to all personnel on Staples' Intranet that contains the above policies and more. *Id.* The complaint procedure in the Associate Guidebook explains to employees the many ways in which a complaint might be filed, how complaints are investigated, and the discipline that may result from such conduct. *Id.*, Attach. N. Retaliation against an employee for filing a complaint or participating in an investigation of a complaint is expressly prohibited by this policy. *Id.*

Staples also provides training to its managers and supervisors at the Mid–Atlantic Distribution Facility on handling employee discrimination complaints and the legal aspects of EEO issues. This training includes an interactive computer-based program on preventing employment discrimination and weekly distribution of the "Manager's Legal Bulletin" to all managers and supervisors. *Id.* Attachs. O, P. For instance, the lead article in the March 1, 2002 *Manager's Legal Bulletin* dealt with how to avoid liability for harassment claims by taking the proper corrective action. *Id.* Attach. P.

At the June 20, 1999, Mid–Atlantic Distribution Center weekly meeting, the topic of the week was "Valuing Diversity." *Id.*

Attach. Q. This meeting, among other things, reinforced Staples "zero tolerance" for jokes, remarks, and comments based on a person's race, color, national origin, or religious beliefs. *Id.* Staples also addressed the topic of diversity in several weekly meetings following the September 11, 2001, terrorist attacks. *Lachenmayr Dep.* at 59–60.

## PLAINTIFF'S DISCRIMINATION CHARGE

Karim filed his preliminary intake questionnaire with the Maryland Commission on Human Relations ("MCHR") on June 3, 1999. *Pl.'s Ex.* 1. On June 21, 1999, he filed a charge of discrimination, which was dual filed with the Equal Employment Opportunity Commission ("EEOC"). *Def.'s Ex.* 16 (MCHR and EEOC charge). The charge alleges that plaintiff was harassed and intimidated by his coworkers because of his national origin and his skin color. *Id.* The alleged harassing/intimidating incidents offered in the charge were those involving Diehl, Mack, and Stottlemyer. The alleged harassing incidents occurred between August 8, 1998, and May 27, 1999, and were not alleged to be continuing in nature. Apparently, plaintiff never amended his administrative charge to include the events that allegedly occurred after his original charge.

On February 14, 2001, the MCHR found that there was no probable cause to believe that plaintiff was discriminated against on the basis of his color or his national origin. *Def.'s Ex.* 17. The written finding also addressed two August 1999 incidents of alleged harassment against plaintiff that arose during the MCHR investigation. *Id.* The EEOC adopted the MCHR's findings and issued plaintiff a right to sue notice on April 6, 2001. *Def.'s Ex.* 18.

## IV.

Defendant mounts a multi-pronged attack on plaintiff's claims, arguing that many of the incidents described above should not be considered probative of a cognizable harassment claim by this court as they are either (1) time-barred; (2) unexhausted; (3) demonstrably unconnected to any animus based on national origin, color, race, or religion; (4) and/or are supported only by inadmissible evidence. Finally, defendant contends that no reasonable jury could reasonably return a verdict in favor of plaintiff on any properly exhausted claim, in any event, because plaintiff has failed to produce sufficient evidence to support each of the elements of his claim or that, even if he was subjected to coworker harassment, Staples is liable for such harassment. Defendant is correct in virtually every such respect.

### *Time–Barred Incidents*

■ In Maryland, a deferral state, a Title VII charge of discrimination must be filed with the EEOC within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e–5(e)(1). "Timeliness requirements for an action alleging employment discrimination are to be strictly enforced." *Tangires v. Johns Hopkins Hosp.*, 79 F.Supp.2d 587, 597 (D.Md.), *aff'd*, 230 F.3d 1354, 2000 WL 1350647 (4th Cir.2000). Discriminatory acts falling outside "the statutory window are time barred from consideration in federal court, unless they can be related to a timely incident as a series of separate but related acts." *Id.* (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir.1997)); *see Van Slyke v. Northrop Grumman Corp.*, 115 F.Supp.2d 587, 592 (D.Md.2000) ("If a charging party fails to comply with this statutorily mandated filing period, alleged discriminatory acts which occurred more than 300 days prior to the filing of the EEOC charge may not subsequently be challenged in a Title VII

suit."), *aff'd*, 17 Fed.Appx. 154, 2001 WL 967503, 2001 U.S.App. LEXIS 19279 (4th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1204, 152 L.Ed.2d 143 (2002). Courts have consistently found claims of discrimination to be barred for failure to file an EEOC charge within the 300 day statutory window. *See, e.g., Lambert v. Washington Suburban Sanitary Comm'n*, 93 F.Supp.2d 639, 642 (D.Md.2000); *Leskinen v. Utz Quality Foods, Inc.*, 30 F.Supp.2d 530, 533 (D.Md.1998).

It is undisputed that plaintiff filed his administrative charge of discrimination with the MCHR on June 21, 1999, having first filed his Preliminary Intake Questionnaire on June 3, 1999. Three hundred days prior to June 21, 1999, was August 25, 1998. The first incident about which plaintiff complained occurred on August 8, 1998, the forklift situation with Diehl, which was 17 days before August 25, 1998. The second event occurred on August 15, 1998, the time-clock incident with Stottlemyer, which was 10 days before August 25, 1998. Thus, plaintiff plainly did not file timely charges with respect to those incidents.

■ Plaintiff argues that the MCHR "did consider fully both the August 8th and August 15th, 1998 incidents. They were not dismissed or disregarded by the Commission .... Although not stated, the Investigator *likely* recognized that these incidents were part of a continuing pattern of discriminatory violations or that equitable tolling should apply to them." *Pl.'s Mem. in Support of Answer to Mot. for Summ J.* at 8 (emphasis added) (citation omitted). Plaintiff is referring to the theory of continuing violation, which permits "incidents outside of the statutory period to survive if they relate to a 'timely incident as a series of separate but related acts' amounting a continuing violation." *Lambert*, 93 F.Supp.2d at 642 (quoting *Beall*, 130 F.3d at 620). However, "even if

the case involves a continuing violation, the law still requires an actual violation within the limitations period." *Id.* (citing *Hill v. AT & T Techs., Inc.*, 731 F.2d 175, 179–80 (4th Cir.1984)).

Plaintiff's contentions are unavailing. First, the Written Finding of the Investigator, *Pl.'s Ex.* 4, does not evidence any likelihood of recognition of a continuing violation claim as plaintiff argues, particularly considering the undisputed fact that the continuing violation box was not marked on the June 21 MCHR charge. *Cf. Leskinen*, 30 F.Supp.2d at 533 ("[The incident] does not evidence a continuing Title VII violation because [the plaintiff] does not even allege that the [incident] was 'part of a continuing pattern or practice of discrimination' rather than an isolated discriminatory act." (citing *Jensvold v. Shalala*, 829 F.Supp. 131, 137 (D.Md.1993))). Second, as discussed *infra*, there is no *present* violation; accordingly, the continuing violation theory cannot be employed. *See Hill*, 731 F.2d at 180 (explaining that to apply the continuing violation theory, there must be a present violation within the required time period (citing *Woodard v. Lehman*, 717 F.2d 909, 914–15 (4th Cir. 1983))).

■ Plaintiff also argues that the principle of equitable tolling is applicable. "Equitable tolling applies 'where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action.'" *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir.1987). There is no evidence that Staples "wrongfully deceived or misled the plaintiff." *Id.* at 1049. No such misrepresentation is even alleged by plaintiff who instead claims not to have seen the posted notice of his Title VII rights and, even if he had seen it, asserts that Staples was remiss in not orally informing him of the notice's contents in light of his professed

difficulty in reading English. Yet, posters summarizing federal and state anti-discrimination laws and providing contact information for the federal and state agencies enforcing those laws have been posted at the facility throughout plaintiff's employment. *Holtzman Decl.* Moreover, there is no legal support, and none is offered, for plaintiff's argument that Staples acted improperly in not providing him with an oral recitation of the posters' contents. Plainly, there is no evidence here to support the application of the equitable tolling doctrine.

### *Lack of Administrative Exhaustion*

 Staples argues that plaintiff's complaint improperly alleges two new causes of action—race- and religion-based hostile work environment—as they were not raised in his administrative charge. The Fourth Circuit has noted that "[t]he allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint.... Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir.1996) (citations omitted).

Staples points out that plaintiff's religion and race are not mentioned or alluded to anywhere in his MCHR charge, which expressly alleges only national origin and color as the two reasons for plaintiff's mistreatment by his coworkers. Staples further states that the harassing conduct alleged in the charge, even Stottlemyer's alleged statement about hating "immigrants," does not raise the specter of race or religious discrimination. Moreover, Staples notes that as evidenced by the MCHR Written Finding, race and religion were never considered as a possible basis

of discrimination by the MCHR during its investigation of plaintiff's charge.

The original Preliminary Intake Questionnaire at the MCHR had race, religion, and national origin checked off as the discrimination complained about. *Pl.'s Ex.* 1. The charge of discrimination clearly only lists as a basis for the charge, color and national origin. Plaintiff contends: "Although it is not of great consequence in this case, because it is based primarily upon national origin and color discrimination, plaintiff argues that his inclusion of allegations of racial and religious discrimination are reasonably related to the color and national origin discrimination claims to be properly before this Court." *Pl.'s Opp.* at 12. Plaintiff then cites to *Thomas v. Bet Sound–Stage Restaurant/BrettCo, Inc.*, 61 F.Supp.2d 448, 457 (D.Md.1999), for the proposition that "Title VII does not require procedural exactness from lay complainants: 'EEOC charges must be construed with utmost liberality since they are made by those unschooled in the technicalities of formal pleading.'" *Id.* (quoting *Alvarado v. Board of Trs. of Montgomery County. Coll.*, 848 F.2d 457, 460 (4th Cir.1988)).

*Thomas* is of scant help to plaintiff. First, the *Thomas* opinion relates to the situation where an aggrieved party brings suit against those not named in their EEOC charge-a fact scenario not in the present case. *Id.* Moreover, the charge unquestionably only lists color and national origin as the bases of the charge. The Fourth Circuit was presented with similar facts in *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 132–33 (4th Cir.2002). The plaintiff's EEOC charge in *Bryant* alleged that defendant discriminated against him based upon race but the complaint, in pertinent part, alleged that defendant discriminated against him based upon color, race, and/or sex. *Id.* at 132.

The court determined that administrative investigation of color and sex discrimination "could not reasonably be expected to occur in light of [plaintiff's] sole charge of race discrimination, and the investigation of the complaint did not touch on any matters other than race discrimination." *Id.* at 133. The court held that "because the scope of [the plaintiff's] complaint exceeds the limits set by the allegations of Bryant's administrative complaint, we cannot analyze the merits of [the plaintiff's] ... color and sex discrimination claims." *Id.*

The same is true in the present case. This court cannot analyze the race and religion claims as they are outside the scope of the administrative complaint. Moreover, plaintiff has not pointed to any aspects of the investigation which would lead to the opposite conclusion. Rather, he simply argues in a conclusory way that the investigation covered religion and race allegations. The written findings of the investigation state that plaintiff claims he has been harassed because "of his color (black) and national origin [Bangladesh]." *Pl.'s Ex.* 4. Accordingly, I agree that plaintiff has failed to exhaust any claim based on race and/or religion. *Cf. Shah v. Mt. Zion Hosp. and Med. Ctr.,* 642 F.2d 268, 270–71 (9th Cir.1981).

### Hearsay Evidence

Staples argues that the following statements amount to hearsay and thus cannot be relied upon to defeat summary judgment, as hearsay evidence may not be considered on a motion for summary judgment, *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996):

(1) Plaintiff hearing from an unnamed person that Ron Stottlemyer told this person he would kill plaintiff if he told Ms. Brisentine about the timeclock incident; (2) Plaintiff hearing from an unnamed employee that Ron Stottlemyer would "wipe his ass" if Plaintiff complained about not getting a letdown on January 22, 1999; and (3) Plaintiff being told by Jim McPeak, who had been told by someone else, that Thomas Mack carried a knife (in connection with Mack allegedly following Plaintiff and McPeak to the AC & T gas station after work on May 27, 1999).

*Def.'s Mem.* at 31. The first statement involving Stottlemyer and the timeclock incident is not admissible as I have determined, *supra,* that this incident occurred outside the 300–day statute of limitations. Plaintiff makes the dubious contention that the second statement is admissible as nonhearsay as a party admission under Federal Rule of Evidence 801(d)(2). Moreover, Plaintiff concedes that the third statement is inadmissible hearsay. *Pl.'s Opp.* at 15–17.

Regardless of evidentiary niceties, it cannot reasonably be concluded from the facts of record that any of the statements were uttered because of plaintiff's color or national origin. *See infra; see also Halasi–Schmick v. City of Shawnee,* 759 F.Supp. 747, 752 (D.Kan.1991) ("Assuming the comments about plaintiff's alleged affair and her being a 'bitter woman,' are admissible as exceptions to the hearsay rule, for example, as admissions, the court does not find that either comment provides support for her claim because they cannot be simply categorized as made 'because of her sex.' "). Moreover, even if these statements are considered, plaintiff's claim of hostile work environment fails as a matter of law, as discussed *infra.*

### Insufficiency of Evidence to Support Hostile Work Environment Claim

To prevail on a Title VII hostile work environment claim, the plaintiff must establish four elements:

(1) unwelcome conduct,

(2) based on [plaintiff's] gender, color, race, religion, or national origin

(3) sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment, and

(4) some basis for imputing liability to [defendant].

*Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 266 (4th Cir.2001) (citing *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 241(4th Cir.2000)). Plaintiff is unable to meet the requirements for establishing the prima facie case of a hostile work environment. Specifically, plaintiff cannot establish that his coworkers' conduct has been sufficiently pervasive or severe to alter the conditions of employment to create a hostile work environment, or that the incidents occurred because of his national origin and color.

As noted above, "[f]or a hostile work environment claim to lie there must be evidence of conduct 'severe or pervasive enough' to create 'an environment that a reasonable person would find hostile or abusive.'" *Von Gunten v. Maryland,* 243 F.3d 858, 870 (4th Cir.2001) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Thus, the standard for proving an abusive work environment is intended to be a high one. *Porter v. Nat'l Con-Serv, Inc.,* 51 F.Supp.2d 656, 659 (D.Md.1998) (race harassment); *see also Norris v. City of Anderson,* 125 F.Supp.2d 759, 766 (D.S.C. 2000) (racial harassment). In assessing whether the harassing quality of the work environment rises to the level of severe and pervasive, a court must look to the totality of the circumstances including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Beardsley v. Webb,* 30 F.3d 524, 529 (4th Cir.1994) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

Moreover, the conduct must be "extreme." *Faragher v. City of Boca Raton,* 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Courts have repeatedly recognized that anti-discrimination laws such as Title VII were not designed to purge all harassing or annoying behavior in the workplace; only that which renders the workplace objectively and subjectively hostile or abusive. *Hartsell v. Duplex Products Inc.,* 123 F.3d 766, 773 (4th Cir.1997) ("Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." (citations omitted)); *see also Scannell v. Bel Air Police Dept.,* 968 F.Supp. 1059, 1063 (D.Md.1997)("Title VII is not designed 'to purge the workplace of vulgarity.'" (quoting *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995))). Furthermore, the Supreme Court has noted that the "ordinary tribulations of the workplace, 'such as the sporadic use of abusive language, . . ., and occasional teasing' are not actionable." *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (citation omitted).

■ None of plaintiff's alleged incidents of harassment, considered separately or in the aggregate, amount to severe or pervasive interference with plaintiff's undisputed right to be free of forbidden harassment. Nor does the evidence in the summary judgment record rationally support the conclusion that these incidents occurred because of plaintiff's color or national origin. Regarding the letdown incident on January 22, 1999, plaintiff admitted that letdowns often take a while, and there is no evidence that the letdown was delayed on account of plaintiff's color or national origin. Moreover, the comment allegedly made my Stottlemyer about "wiping [plaintiff's] ass"

though vulgar does not amount to actionable abusive behavior, and again, there is no evidence that the comments were made based on plaintiff's color or national origin. As for the Mack incident on May 24, 1999, telling a coworker to "shut up" amounts, if to anything, to discourteous incivility. In addition, a full investigation was conducted in relation to this incident and no evidence was presented that Mack acted on the basis of plaintiff's national origin or color. As stated *supra*, the investigation indicated that plaintiff was at least partially responsible for this event.

The same is true with the Streets and the DeHoyos incidents. Plaintiff has not questioned and cannot question the careful and professional manner in which Staples conducted its investigations of these and all of the incidents in accordance with its established anti-discrimination policies and complaint procedures. The evidence presented does not demonstrate that the remarks made by Streets and DeHoyos were in any way related to plaintiff's national origin or color. Moreover, these statements, again, are merely unpleasant. As for the Perrot forklift incident, plaintiff did not even report it, and the evidence shows that such accidents are a routine occurrence at plaintiff's workplace. Indeed, plaintiff has been Creeden, and Hamil incidents were also misunderstandings with plaintiff.

Indeed, the Hamil incident is especially indicative of the shortcomings of plaintiff's case. Hamil, who did not even work with plaintiff, had no notion that it was his clipboard and coat on the pallet jack when she removed those items. Thus, any possible inference of animus toward plaintiff is utterly negated. Both she and Human Resources Manager, Jay Rudolph, explained this to plaintiff in a meeting, and both apologized for Hamil's innocuous actions. Nevertheless, plaintiff insists that this incident supports his claim for hostile environment.

Additionally, even if, contrary to plaintiff's concession that he found his coworkers' questions about Bangladesh and about Muslims to be funny and that these remarks did not bother him, such comments, understandably, disturbed him greatly, the isolated and sporadic nature of the comments fall far short of the quantum of evidence necessary to an actionable harassment claim. *See Baskerville*, 50 F.3d at 431 ("The infrequency of the offensive comments is relevant to an assessment of their impact. A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1456 (7th Cir.1994); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 & n. 3 (7th Cir.1994))); *Cowan*, 141 F.3d at 758 (same); *see also Hartsell*, 123 F.3d at 773 (explaining that "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace" (internal quotation marks omitted) (citation omitted)).

Accordingly, the evidence in this record is woefully insufficient to amount to a showing of a hostile work environment. *See Chika v. Planning Research Corp.*, 179 F.Supp.2d 575, 588 (D.Md.2002) (finding no hostile work environment despite allegations that plaintiff was referred to as "asshole," "dick," and "knucklehead" on various occasions). *But see Collier v. Ram Partners, Inc.*, 159 F.Supp.2d 889 (D.Md. 2001) (denying summary judgment as to claim of hostile work environment where (1) racial epithets were used repeatedly; (2) were coupled with physical threats; and (3) evidence supported the conclusion that racial epithets were knowingly tolerated by management); *Demby v. Preston Trucking Co., Inc.*, 961 F.Supp. 873, 881

(D.Md.1997) (denying summary judgment as to hostile work environment claim where (1) racial epithets were used repeatedly; (2) plaintiff recounted several incidents involving disparate treatment; and (3) plaintiff's work space had been vandalized with a painted swastika and a threatening and offensive phrase).

Even when plaintiff's allegations are viewed in their entirety, plaintiff is unable to meet the high standard required to establish a hostile work environment claim. Here, the basis of plaintiff's harassment claims rests upon a handful of unkind remarks, misunderstandings, and accidents. However, their severity is undoubtedly minimal. *Cf., e.g., Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (explaining that "instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments" (internal quotation marks omitted) (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994))); *Baskerville v. Culligan International Co.*, 50 F.3d 428, 431 (7th Cir.1995) (finding nine incidents over a seven-month period not severe or pervasive in part because they were "unlikely to have so great an emotional impact as a concentrated or incessant barrage"); *Cowan v. Prudential Insurance Co. of America*, 141 F.3d 751, 757–59 (7th Cir.1998) (determining that sporadic comments over two years insufficiently severe or pervasive to create a hostile work environment). Moreover, plaintiff has made no effort to explain how these Title VII-neutral statements and incidents are in any way severe and pervasive. There is no explanation as to why minor vehicle accidents, occasional use of profanity, or disrespectful language by his fellow warehouse workers, his not receiving a letdown, having his clipboard and jacket removed from a pallet jack by another shift supervisor who though these items belonged to someone else, constitute harassment against plaintiff because of his national origin or color. *See Pl.'s Opp.* at 19–20.

Plaintiff relies heavily on *Collier v. Ram Partners, Inc., supra*, in which I denied defendant's motion for summary judgment as to plaintiff's claim of hostile work environment. I there concluded that the summary judgment record showed the plaintiff was subject to "incessant use of racial invective," the comments were clearly made on account of the plaintiff's race, and she was subject to repeated use of the "ancient epithet nigger," which was condoned and tolerated by the employer. *Collier*, 159 F.Supp.2d at 898–900. *Collier* is easily distinguishable from the present case. In this case, there is nothing approaching the severity or pervasiveness of that conduct, and no condonation of any misconduct. For instance, Staples was quick to discipline Diehl, Nyberg, and Hamil for conduct that had nothing to do with plaintiff's national origin or color. Therefore, for the foregoing reasons, plaintiff's reliance on *Collier* is misplaced.

## V.

For the reasons set forth above, plaintiff's motions shall be denied and defendant's motion shall be granted. An Order entering judgment in favor of defendant and against plaintiff follows.

## ORDER

For the reasons stated in the foregoing Memorandum, it is this 23rd day of July, 2002, by the United States District Court for the District of Maryland, ORDERED

(1) That plaintiff's "Motion to Stay Ruling on Motion for Summary Judgment and for Extension of Discovery Deadline" is DENIED; and it is further ORDERED

(2) That defendant's motion for summary judgment is GRANTED AND JUDGMENT IS HEREBY ENTERED

IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; and it is further ORDERED

(3) That the Clerk shall TRANSMIT a copy of this Order and the foregoing Memorandum to counsel and CLOSE THIS CASE.