Ruby **PURNELL**, Plaintiff,

v.

State of **MARYLAND**, Defendant.

No. CIV. RDB–02–3078.

United States District Court, D. Maryland.

March 18, 2004.

---

Robin R. Cockey, Cockey Brennan and Maloney, Salisbury, MD, for Plaintiff.

Joseph P. Gill, Paul J. Cucuzzella, Office of the Attorney General, Annapolis, MD, for Defendant.

## MEMORANDUM OPINION

BENNETT, District Judge.

Before the Court is Defendant State of Maryland's ("Defendant" or the "State") Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to Plaintiff Ruby Purnell's ("Plaintiff" or "Purnell") Complaint. The issues have been fully briefed by the parties, and oral argument is not necessary. *See* Local Rule 105.6 (D.Md.2001). For the reasons set forth below, the Defendant's Motion will be GRANTED in part and DENIED in part.

## BACKGROUND

The Plaintiff brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et seq.*, against the State of Maryland.[1] The Plaintiff alleges that the State discriminated against her, on the basis of race, by denying her a promotion and harassing her.

The following facts, and reasonable inferences therefrom, are viewed in the light most favorable to Purnell, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Purnell is an African–American female. She began working full-time for the State of Maryland's Department of Natural Resources (the "DNR") as a laborer in 1971. From 1971 to 1988, Purnell received various job promotions from Clerk Typist to Office Clerk and finally to Office Supervisor, a position which she held from 1988 until the time that she left the DNR in 2001. In

---

1. The Plaintiff's Complaint originally contained a similar employment discrimination count pursuant to 42 U.S.C. § 1981. This Court dismissed that count with prejudice on April 28, 2003.

February of 2000, Purnell was transferred from the DNR's Pocomoke Forest State Park Field Office ("Pocomoke") to the DNR's Eastern Regional Office based at the Salisbury, Maryland Regional Service Center ("Salisbury"). She remained in Salisbury from February of 2000 until August of 2001.

Purnell "felt" that the DNR work environment was "racially charged." (Complaint, ¶ 7; Deposition of Purnell at 39–41.) Purnell avers that her work "situation worsened" upon being transferred to Salisbury. (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 3.) As the only African–American employee in the approximately 30 to 35–person Salisbury office (Plaintiff's Answer to Interrogatory No. 4, ¶ 5), Purnell "felt ostracized and isolated by her co-workers and by her immediate supervisor, Captain Daryl DeCesare ('DeCesare')."[2] Id. Purnell states that her co-workers at Salisbury told racially oriented jokes and made other racially demeaning statements. (Complaint, ¶ 7.) Moreover, Purnell indicates that on a daily basis her co-workers would deliberately ignore and isolate her, would laugh and whisper about her, would roll their eyes at her, and would scatter and return to their offices when they saw her approaching, all of which Purnell believed to be racially motivated. (Plaintiff's Answer to Interrogatory No. 3.)

In support of her general allegations, Purnell specifically relates four incidents from her approximately eighteen month tenure at Salisbury as evincing a racially hostile work environment. The first incident occurred just after her arrival at the Salisbury office. A fire alarm went off as part of a fire drill, but Purnell was unaware that the sound she heard was the fire alarm. As she watched her co-workers file by her office, Purnell stayed at her desk. According to Purnell, no one alerted her that the sound was a fire alarm or that the accompanying mass egress from the building resulted from the alarm. Eventually, Purnell exited the building and went outside, where she found her fellow employees.

The second incident occurred in November of 2000 at Salisbury. On that occasion, Purnell encountered another DNR employee, Rachel Horsey ("Horsey"), in an office elevator. According to Purnell, Horsey asked why Purnell wanted to work where she "was not wanted," and stated that "no one in the office liked [Purnell] or wanted [her] to be there." (Deposition of Ruby Purnell at 36–38.)

The third incident also occurred some time in 2000 at Salisbury, when Purnell overheard Horsey and Doug Wigfield ("Wigfield"), another DNR employee, talking outside of Purnell's office. According to Purnell, Horsey related to Wigfield that the office felt different. (Deposition of Ruby Purnell at 41.) Wigfield then asked Horsey if she wanted to hear his "chocolate bunny joke," to which Horsey replied, "yes, go ahead, tell me about your chocolate bunny joke." Id. at 42. Immediately thereafter, Purnell closed her office door, and did not hear the rest of the conversation. Id.

The fourth incident involved DeCesare, a DNR Regional Administrator and Purnell's supervisor, and occurred in July and August of 2001 at Salisbury.[3] DeCesare

2. During the two-year period from January 2000 to January 2002, just two other African–Americans were employed in the DNR's Eastern Region: (1) Shelton Waters, Jr., a Tuckahoe State Park Ranger; and (2) Journal Jones, a Janes Island State Park Technician who retired on June 30, 2001. (Defendant's Answer to Interrogatory No. 4.)

3. With limited exceptions, Purnell is the only staff member that DeCesare has ever supervised within the Salisbury office. (Deposition of Darryl DeCesare at 20–21.)

had volunteered the services of Purnell to Janes Island State Park ("JISP"), located in Crisfield, Maryland, while JISP's regular administrative assistant was out on sick leave. Purnell received word of the assignment on July 27, 2001. According to Purnell, when informing her of the assignment, DeCesare remarked that "since you don't like it here anyway, I thought you might like it near the water again." (Plaintiff's Answer to Interrogatory No. 11.) Purnell returned from the assignment on August 7, 2001, because JISP staff members told her that her services there were not needed. Upon returning to Salisbury from JISP, Purnell left a letter for DeCesare detailing her displeasure with being sent on the assignment. Purnell's three-page letter to DeCesare stated, in part:

> The purpose of this letter is to let you know that I do not enjoy nor appreciate traveling here and there, adding an additional 100 miles per week in traveling to the workplace, putting additional wear and tear on my vehicle, getting up earlier than usual and getting home later than normal. I feel your decision to volunteer me to go to [Janes Island] ... was unjustified, unfair and not logical nor practical. Especially [ ] when I see the improper managing of those already assigned there and not using those people to the "fullest," or even offering other alternatives other than sending me down there ... Are you trying to cause me more hardship or is it your intention to inflict additional emotional distress?

(August 2, 2001 Letter from Purnell to DeCesare.) According to Purnell, DeCesare became enraged upon reading the letter and angrily stated to Purnell, *inter alia*, that she had "nerve to write me something like this," "tell me where do you get off," "[t]ell me who do you think you are," and "I don't have to take it from you, especially the likes of you." (Plaintiff's Answer to Interrogatory No. 11.) DeCe-

sare slammed cabinet drawers, pounded his fist on Purnell's desk, slammed his door, and pointed his finger at Purnell during his rant, all of which scared Purnell. Once alone, Purnell began to cry. Shortly thereafter, Purnell left work, citing a terrible headache, and never returned to the Salisbury office. In fact, Purnell did not work from that day forward, taking a disability retirement on April 25, 2002 (Plaintiff's Answer to Interrogatory No. 19; State of Maryland Department of Budget and Management Processing Form, April 25, 2002 (Defendant's Exhibit 1).)

Purnell never specifically informed DeCesare or anyone else within the DNR's management or its Fair Practices Office about the elevator conversation with Horsey or the "chocolate bunny joke." (Deposition of Ruby Purnell at 38, 43.) However, Purnell did inform DeCesare "maybe twice about the environment" in the Salisbury office and expressed to him that "there was a problem," but, "by his demeanor" he "did not want to hear what [Purnell] had to say." (Deposition of Ruby Purnell at 40, 49.)

In addition to the aforementioned incidents, Purnell also felt discriminated against because her employment position with the DNR was not upgraded from the Office Supervisor series to the Administrative Specialist series during the year 2000 or 2001. Around the time of Purnell's transfer from Pocomoke to Salisbury, the DNR's Human Resources Department began a study, and accompanying reclassification, of administrative-type positions in the DNR. The first part of this study examined positions in DNR field offices, such as the one that Purnell held before her transfer to Salisbury, to determine if the duties being performed by the people holding those positions warranted a reclassification. Purnell was called upon by the Human Resources Department to describe

the duties that she had performed while at Pocomoke to aid in the study.

During the first part of the study, which was completed under the direction of DNR employee Jennifer Swartswelder ("Swartswelder"), only the Office Supervisor positions at park or field offices, such as Pocomoke, were studied. These positions were studied together because of the similarity of the functions performed by the Office Supervisors in the field offices. The study of Office Supervisors at the field offices was completed on August 3, 2000, and all of the supervisors were upgraded, with the exception of the person occupying Purnell's old position. Although the DNR identified Purnell's former position for reclassification, Purnell's replacement was not upgraded immediately because of her brief tenure in the position, having replaced Purnell within just a year of the reclassifications.

Purnell's position at the Salisbury Regional Office was not a part of this initial reclassification, because it was a regional office position and not a field office position. Other similarly situated office positions, such as the Western Regional Office position held by Rita Naselrod, a Caucasian DNR employee, also were not a part of the initial reclassification study. Once the initial reclassification was complete, the DNR's Human Resources Department began its study of other positions, which included the regional office positions and about seven other similarly situated DNR office positions that had been identified as being in need of separate study. At that time, seven of the employees that occupied these nine positions were Caucasian. The positions of Purnell at Salisbury and Mary Taylor, a Caucasian employee similarly situated to Purnell but located at the DNR's Somer's Cove Marina office, were to be a part of this next examination. The DNR stated that the office positions studied secondarily for reclassification were unique and different from the Office Specialists in the field offices, and thus had to be analyzed individually.

The completion of the second study suffered several delays. A DNR-imposed freeze on hiring, promotion, and reclassification in 2000 initially delayed the study, and an identical State-imposed freeze, in 2001, later caused a further delay. On top of the freezes, there was a backlog of positions, aside from just office positions, earmarked for reclassification studies throughout the DNR.

At the time of Purnell's departure on August 9, 2001, the second reclassification study had not been completed. However, the study of Purnell's position had begun, and it preliminarily had been identified as one that would be re-classified into the Administrative Aide series, which carried the same pay grade as the Administrative Specialist series. Ultimately, many of the positions individually examined as a part of the second study were reclassified. For instance, on August 29, 2001, Taylor's position was upgraded to the Administrative Specialist series, retroactive to August of 2000, and on November 11, 2001, the position of Robin Cottrell, an African–American female employee, was upgraded from Fiscal Clerk to Office Secretary.

On July 28, 2001, eleven days before leaving her employment with the DNR, Purnell filed a Charge of Discrimination with the Maryland Commission on Human Relations and the Equal Employment Opportunity Commission (the "EEOC"), alleging, in pertinent part, that: (1) she had filed a complaint within her agency about the hostile, offensive and intimidating work environment, racial discrimination, unethical practices, lack of opportunity, no advancement and unfair work practices executed by her supervisor; and (2) she had been overlooked for a position reclassifica-

tion since May 30, 2000.[4] (July 28, 2001 Charge of Discrimination (Defendant's Exhibit 18).) The EEOC was unable to establish Purnell's claims, and issued her a "Right to Sue" letter on June 20, 2002. Purnell filed a Complaint with this Court on September 18, 2002, and the Defendant's pending Motion for Summary Judgment followed upon the conclusion of discovery.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is . . . to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded [fact finder] could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. In this inquiry, a court must view the facts and the reasonable inferences therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but the opponent must present evidence upon which a reasonable finder of fact could rely. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of a mere "scintilla" of evidence in

support of the nonmoving party's case is insufficient to preclude an order granting summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## DISCUSSION

### I.  Failure to Promote Claim

#### A.  Statute of Limitations

Initially, the State argues that Purnell's failure to promote claim is barred by the applicable 300–day statute of limitations contained in Title VII. *Jackson v. State of Maryland*, 171 F.Supp.2d 532, 540 (D.Md.2001); 42 U.S.C. § 2000e–5(e)(1)(2003). Purnell's Complaint provides that she was discriminated against because her position was not reclassified into the Administrative series, when, "in the spring and summer of 2000, DNR began upgrading supervisors in the DNR field offices to administrative specialist." (Complaint, ¶ 8.) The State asserts that Purnell learned in August of 2000, when the first reclassification study was completed, that her current position was not among those that initially had been studied for reclassification. Thus, the State contends that by filing her Charge of Discrimination regarding a failure to promote on July 28, 2001 with the Maryland Commission on Human Relations and the EEOC, Purnell failed to meet the requisite 300–day statute of limitations.

■ However, Purnell's claim, when viewed in the light most favorable to her, does not rest simply on the failure to be reclassified in the initial year 2000 reclassification. Indeed, Purnell's Complaint also alleges that "[d]uring the summer and fall of 2000, and into the spring of 2001, [she] repeatedly requested that she be included in the pending promotions/upgrades, to no avail." (Complaint, ¶ 9.)

4. Purnell's Complaint filed with this Court does not contain a claim of retaliation.

Viewed in the light most favorable to her, Purnell's failure to promote claim consists of an interrelated set of failure to promote incidents, starting with the initial reclassification study in 2000 and finishing with the second reclassification study that extended past the spring of 2001. Essentially, Purnell's claim is that she should have been promoted each and every day since the summer of 2000. As such, Purnell's failure to promote claim consists of a " 'series of separate but related acts' amounting to a continuing violation" following the conclusion of the initial reclassification study. *Beall v. Abbott Laboratories,* 130 F.3d 614, 620 (4th Cir.1997) (quoting *Jenkins v. Home Ins. Co.,* 635 F.2d 310, 312 (4th Cir.1980) (per curiam)). Accordingly, Purnell's failure to promote claim cannot be said to be untimely, as she brought it within 300 days of the second reclassification study, which was ongoing in the spring of 2001.

## B. *Failure to Promote Under Title VII*

Purnell does not proffer direct evidence of a discriminatory motive (e.g., race-related comments made directly to her or statements about her race in conjunction with any employment action) regarding the alleged discriminatory failure to promote by the State. Thus, Purnell must rely on the familiar three-step burden shifting model of circumstantial evidence of racial discrimination delineated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In order to establish a claim of a failure to promote based on race under Title VII, the plaintiff bears the initial burden of proving a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. 1817. To state a valid prima facie case of a discriminatory failure to promote, a plaintiff must show that (1) she is a member of a protected group; (2) she applied for the position; (3) she was qualified for the position; and (4) she was rejected under circumstances giving an inference of unlawful discrimination. *Id.; Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994).

If a prima facie case is established, the burden then shifts to the defendant to rebut the inference. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. While the defendant's burden is not onerous, it must articulate "some legitimate, nondiscriminatory reason" for the disparate treatment. *Id.* In this regard, the Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination" so that "when an employer articulates a reason for [its treatment of the plaintiff] not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [employment decision]." *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 298–299 (4th Cir.1998) (internal quotations and citations omitted).

If the defendant articulates a legitimate, non-discriminatory reason for its conduct, the ultimate burden shifts to the plaintiff to show that the defendant's stated reason is "pretextual" or false. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. In evaluating whether the plaintiff has adduced a sufficient quantity of proof, the court may consider the relative strength of the employer's asserted nondiscriminatory reasons. *Burns v. AAF–McQuay, Inc.,* 96 F.3d 728, 732 (4th Cir.1996). However, unsubstantiated allegations and bald assertions will not carry the day for the employee. *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 960 (4th Cir.1996); *see also Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988) (stating that the plaintiff's own opinions and conclusory allegations do not have sufficient "probative force to reflect a genuine issue of

material fact"). If the plaintiff cannot present facts that would permit a reasonable inference that the stated reason is a pretext for discrimination, summary judgment in favor of the defendant is granted. *See Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir.2000).

Purnell is unable to establish a prima facie case of a discriminatory failure to promote under the test set forth in *McDonnell Douglas Corp. v. Green, supra*, and *Carter v. Ball, supra.* Purnell, as an African–American female, fulfills the first prong of the requisite test because she is a member of a protected class. Moreover, as the DNR indicated, Purnell's reclassification was in progress and likely would have resulted in a position upgrade had she not voluntarily left the DNR. Thus, viewing that fact in the light most favorable to Purnell, she was qualified for the upgraded position, thereby fulfilling the third prong of the test. *See United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 717, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (stating that to establish that she was qualified for the position, the employee is not required to show that she was the most qualified applicant or as qualified as the person chosen for the position).

However, Purnell's situation does not lend itself to easy fulfillment of the second and fourth prongs of the *McDonnell Douglas* test for a discriminatory failure to promote. Instead of involving a scenario where a plaintiff applies for an open position and is rejected under circumstances giving rise to an inference of racial discrimination, such as when the position applied for is filled by a less qualified member of a non-protected class, Purnell's discrimination claim arises from an employer-initiated, systematic reclassification study of all office positions. Furthermore, instead of presenting a situation where a plaintiff plainly is denied a promotion, the undisputed facts of the instant case show that the employer-driven reclassification study involving Purnell's position was still in progress when Purnell left Salisbury.

█ In the present case, the undisputed evidence indicates that Purnell's regional office position, along with eight other similarly situated positions, of which seven were filled by Caucasian employees, were not studied in the initial reclassification, but rather in the second reclassification study. It is clear that the initial reclassification focused on office positions located at park or field locations. The undisputed evidence further shows that, as part of the second study, the reclassification of Purnell's regional office position had begun prior to her decision to leave Salisbury. Additionally, it is undisputed that the DNR-imposed reclassification freeze and the State-imposed reclassification freeze both served to slow the second reclassification study process. Moreover, many of the positions that were individually studied as a part of the second study ultimately received a reclassification during the time span between June 2001 and September 2002. For instance, on November 11, 2001, the position of Robin Cottrell, an African–American female employee, was reclassified from Fiscal Clerk to Office Secretary. Quite simply, there is not any evidence that Purnell's position would not have been reclassified similarly had she stayed on as a DNR employee at Salisbury. Even viewing the evidence in the light most favorable to her, the plain fact is that Purnell left her employment at Salisbury while the reclassification of her position was in progress, thereby effectively removing herself from the reclassification process.

Purnell has not produced more than a mere scintilla of evidence that the coordination of the reclassification process was motivated by racially discriminatory intent.

Purnell's subjective belief that the reclassification of her position was being unfairly delayed or never would have occurred because of her race is insufficient to establish that she was denied a promotion which she sought. *See Evans v. Technologies Applications & Serv. Co., supra; Goldberg v. B. Green & Co., supra.* Thus, Purnell cannot establish a prima facie case because she cannot demonstrate that she was denied a promotion which she sought. *See Day v. Patapsco & B.R.R. Co.,* 504 F.Supp. 1301, 1311 (D.Md.1981) (finding that the plaintiff could not establish a prima facie case without evidence that he was denied a promotion sought, in a case where the plaintiff had voluntarily resigned from the promotion sought).

▮ Finally, even assuming, *arguendo,* that Purnell could establish a prima facie case, her claim would not survive the remainder of the *McDonnell Douglas* tripartite framework. Were she able to establish a prima facie case, the burden of production would shift to the State to produce a legitimate, non-discriminatory reason for the non-promotion. *Tex. Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). The State has proffered that Purnell's regional office position, like other similarly situated positions, was being studied as a part of the second reclassification study, and, in fact, the study of Purnell's regional office position actually had begun prior to her departure. The State having produced a legitimate, non-discriminatory reason for the alleged non-promotion, thereby shifts the burden to Purnell to show a discriminatory pretext. *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097.

Again, however, Purnell fails to generate a scintilla of evidence to demonstrate that the State's proffered reason is but a mere pretext for discrimination. Purnell's attempt to raise a discriminatory inference based upon the reclassification of Taylor, a Caucasian employee similarly situated to Purnell, clearly is insufficient. Taylor, like Purnell, was not employed at a park location and, therefore, was not studied as a part of the initial reclassification. Eventually, Taylor's position was reclassified as a part of the second study. Purnell's subjective belief that Taylor received more favorable treatment in the reclassification process because she was a Caucasian is completely undermined by the simple fact that Purnell left her position in the midst of the reclassification process, three weeks prior to Taylor's reclassification being approved. Indeed, the example of Taylor's reclassification supports the State's legitimate stated reason, as it demonstrates that the second reclassification study was ongoing at the time of Purnell's departure and ultimately did result in position reclassifications. Thus, Purnell's bald allegation of discriminatory intent again is insufficient to carry her burden for purposes of the pending summary judgment motion. *See Evans v. Technologies Applications & Serv. Co., supra; Goldberg v. B. Green & Co., supra.* Therefore, for all of the above reasons, Purnell's claim of discriminatory refusal to promote under Title VII is unsustainable, and the State's Motion for Summary Judgment regarding this issue is GRANTED.

## II. *Hostile Work Environment Claim*

▮ Purnell also asserts a claim that she was racially harassed while working for the DNR. Racial harassment that creates a "hostile work environment" is actionable under Title VII because it amounts to discrimination in the conditions of employment. *Meritor Svgs. Bank v. Vinson,* 477 U.S. 57, 63–68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983). To establish a prima facie case of racial harassment

based on a hostile work environment, a plaintiff must demonstrate that the conduct she complains of was: (1) racially based; (2) unwelcome; (3) so severe or pervasive that it altered her conditions of employment and created an abusive work environment; and (4) capable of being imputed, for liability purposes, to the employer. *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998); *Karim v. Staples, Inc.*, 210 F.Supp.2d 737, 751–52 (D.Md.2002). "[T]he standard for proving [a hostile] work environment is intended to be a high one." *Karim*, 210 F.Supp.2d at 752 (citations omitted). "[T]he conduct must be 'extreme'" and isolated or sporadic comments generally will not suffice. *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

In support of her general allegations of encountering a daily hostile work environment, Purnell has alleged four specific incidents of unwelcome harassment based on her race while working at Salisbury. She believes that each of the following possessed racial animus: (1) the fire drill incident; (2) the comments made in the elevator by Horsey; (3) the conversation between Horsey and Wigfield; and (4) the confrontation with DeCesare.

Purnell meets the first prong of the applicable test in that it is clear that the incidents were unwelcome. This is especially so given her filing of an EEOC Charge of Discrimination, her closing of her office door upon the start of the "chocolate bunny joke," and her crying and leaving work, never to return, following the incident with DeCesare.

To fulfill the second prong for her hostile workplace claim, Purnell must show that the unwelcome incidents complained of were based on race. Viewing the evidence, and reasonable inferences therefrom, in the light most favorable to Purnell, a rational fact-finder could find that three of the incidents alleged were based on racial animus: Horsey's pointed comments in the elevator to Purnell about working where she "was not wanted" and no one in the office liking her, the "chocolate bunny" joke, and Purnell's assignment to JISP, where her services were not needed, and DeCesare's related outburst in which he stated "I don't have to take it from you, especially the likes of you." However, even when viewed in the light most favorable to Purnell, the fire drill incident, at best, shows a lack of forethought or consideration by other employees insufficiently linked to a racially discriminatory connotation. *See Jackson v. State of Maryland*, 171 F.Supp.2d at 541 (finding that a "direct or inferential connection between [the plaintiff's] allegations and her race" is necessary to sustain a harassment claim).

■ Purnell must next show that the three remaining incidents were so severe or pervasive as to create a hostile work environment. To determine whether the State's conduct was so severe or pervasive as to create an abusive or hostile working environment, the Court must examine the evidence from the perspective of both the plaintiff and a reasonable person in the plaintiff's position. *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir.1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir.1990). As the Fourth Circuit Court of Appeals recognized, the "line between a merely unpleasant working environment . . . and a hostile or deeply repugnant one may be difficult to discern." *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir.1996) (internal quotation omitted). Although there is no precise test for a sufficiently hostile work environment, this Court evaluates "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere of-

fensive utterance; and whether it unreasonably interferes with an employee's work performance." *Karim*, 210 F.Supp.2d at 752 (internal quotation omitted); *Settle v. Baltimore County*, 34 F.Supp.2d 969, 993 (D.Md.1999).

Upon viewing the totality of the circumstances in the light most favorable to Purnell, this Court concludes that Purnell has established a prima facie case. A reasonable person could find that Purnell's work environment possessed "discriminatory intimidation, ridicule, and insult," *Meritor Svgs. Bank*, 477 U.S. at 65, 106 S.Ct. 2399, and Purnell obviously perceived the environment to be an abusive one. Purnell, the only African–American employee in the office, was pointedly asked why she was working where she "was not wanted" and told that "no one in the office liked [her] or wanted [her] to be there." Moreover, just outside of her office, her co-workers stated that the office felt different and proceeded to tell a "chocolate bunny joke." Finally, following Purnell questioning why she had been volunteered to go to JISP, where her services were not needed, her supervisor went on an angry, physically threatening verbal rant, stating to Purnell, in part, that he did not "have to take it from you, especially the likes of you." In light of the fact that Purnell was the only African–American employee in the relatively small workplace at Salisbury, a reasonable fact-finder could readily conclude that these events were not trivial but rather indicative of a racially hostile environment sufficiently severe to culminate in Purnell abruptly ending her 30-year employment with the DNR. *See Collier v. Ram Partners, Inc.*, 159 F.Supp.2d 889,

901 (D.Md.2001) (denying summary judgment as to claim of hostile work environment); *Demby v. Preston Trucking Co., Inc.*, 961 F.Supp. 873, 881 (D.Md.1997) (same).

Nonetheless, the State avers that Purnell's racial harassment claim cannot survive summary judgment because she failed to bring any such complaint to the attention of the DNR's management. An employer may escape liability in a hostile work environment claim "if it can demonstrate, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 186 (4th Cir.2001) (internal quotation and citation omitted). In support of its argument, the State points out that Purnell testified that she never informed DeCesare or anyone else within the DNR's management or its Fair Practices Office about the elevator conversation with Horsey or the "chocolate bunny joke." (Deposition of Ruby Purnell at 38, 43). Thus, the State avers that it cannot be liable because the DNR never had an opportunity to identify and correct the alleged harassing behavior.

However, according to Purnell's Charge of Discrimination, which covered the period of September 1, 2000 through May 30, 2001, she "filed a complaint within [her] agency about the hostile, offensive and intimidating ... work environment ... and unfair work practices executed by my supervisor." [5] (Defendant's Exhibit

---

**5.** In her Answers to Interrogatories, Purnell stated that, in 1999, she had filed a complaint of discrimination against her previous immediate supervisor, Lieutenant Gary Adelhart ("Adelhart"). (Plaintiff's Answer to Interrogatory No. 5.) Based upon the present record,

it is unclear whether the supervisor being referenced to by Purnell in her Charge of Discrimination is DeCesare or Adelhart, which alone creates a genuine dispute of material fact regarding sufficient notice to the State of the Salisbury environment.

18.) Moreover, Purnell's August 2, 2001 letter to DeCesare, her supervisor, specifically raised the issue of whether he was attempting to "inflict additional emotional distress" upon her. Furthermore, Purnell testified that she spoke to DeCesare "maybe twice about the environment" in the Salisbury office and that she expressed to him that "there was a problem," but, "by his demeanor" he "did not want to hear what I had to say." (Deposition of Ruby Purnell at 40, 49.) These facts, and the reasonable inferences therefrom, when viewed in the light most favorable to Purnell, are sufficient to create a material factual dispute regarding whether the DNR, through an internal complaint or, in particular, through complaints made by Purnell to her supervisor, had actual or constructive knowledge of the alleged hostile environment at Salisbury and failed to take adequate remedial action. *See, e.g., Collier,* 159 F.Supp.2d at 901.

In short, viewing the available evidence in the light most favorable to her as the non-moving party, Purnell has established a prima facie case of a hostile work environment and the State has failed to rebut the claim as a matter of law. Therefore, the State's Motion for Summary Judgment regarding this issue is DENIED. This Court notes, however, "that reasonable minds could choose not to believe all or significant portions of [Purnell's] evidence, or might reasonably decline to draw the inferences she urges[; however,] [b]ecause genuine issues of fact remain, [the State's] motion for summary judgment cannot be granted on the hostile environment claim." *Collier,* 159 F.Supp.2d at 901.

### CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment is GRANTED regarding the Plaintiff's failure to promote claim, but is DENIED regarding the Plaintiff's hostile environment discrimination claim. A separate Order follows.

### ORDER AND JUDGMENT

For the reasons stated in the foregoing Memorandum Opinion, it is this 18th day of March 2004, by the Court, ORDERED and ADJUDGED:

1. That the Defendant's Motion for Summary Judgment (Paper 21) is GRANTED with respect to the Plaintiff's failure to promote claim; and

2. That the Defendant's Motion for Summary Judgment (Paper 21) is DENIED with respect to the Plaintiff's hostile work environment claim.

The Clerk of the Court shall forward a copy of this Order and Memorandum Opinion to both parties.